# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Home Not Alone Caregiver Services,   :
Inc. and Guarantee Insurance Company, :
                    Petitioners    :
                                  :
             v.                 :   No. 852 C.D. 2015
                                  :   Submitted: October 16, 2015
Workers' Compensation Appeal     :
Board (Galore),                    :
                    Respondent    :


BEFORE:   HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                 **FILED: December 16, 2015**

         Petitioners Home Not Alone Caregiver Services, Inc. (HNA) and Guarantee Insurance Company petition for review of an order of the Workers' Compensation Appeal Board (Board). The Board reversed a decision of a Workers' Compensation Judge (WCJ), denying the workers' compensation claim petition filed by Linda Galore (Claimant). We affirm the Board's order.

         On October 24, 2012, Claimant filed a claim petition, alleging that she worked for HNA as a caregiver and that, on October 2, 2012, she sustained a disabling injury in the course of her employment. HNA, through its insurer, denied the claim petition, averring that no employment relationship existed between HNA and Claimant. HNA asserted that Claimant was an independent contractor.

The WCJ bifurcated the proceedings in order to address first HNA's claim that no employment relationship existed. During the WCJ's hearings, Claimant offered her own testimony regarding the work she performed as a caregiver and the testimony of Amy Lutz, HNA's former Staff Coordinator. HNA offered the testimony of Kelly Bell, who works for HNA as a staff supervisor/coordinator and Khaled Daoud, M.D., HNA's Director and co-owner.

The WCJ did not find credible Claimant's testimony or the testimony of her witness, Ms. Lutz. The WCJ found the testimony of Ms. Bell and Dr. Daoud credible. Ms. Bell testified that HNA provides caregiver services "like personal care . . . light housekeeping, stuff like that." (Reproduced Record (R.R.) at 19a.) Ms. Bell testified that HNA conducts interviews of its prospective caregivers. (R.R. at 20a.) The interview involves filling out an application, copying of a caregiver's identification, criminal background checks, and "screening" for the purpose of "try[ing] to make sure they seem like an appropriate person to send out to the participant's home." *Id.* Ms. Bell testified that HNA offers work to particular caregivers if it feels the client and the caregiver are a good match. (R.R. at 21a.) "We tell them what the hours are that the client might be needing . . . what their needs are." *Id.* Ms. Bell testified regarding a document offered into evidence, which Claimant signed, and which was characterized as an independent contractor agreement. *Id.* Ms. Bell explained that the agreement included information advising caregivers that HNA does not withhold taxes from caregivers' pay checks and does not provide any benefits such as insurance. (R.R. at 22a.)

Ms. Bell described the manner in which HNA made assignments to its caregivers. "We would call them over the phone, tell them the service order that

2

we received from the state from a particular client . . . . We would just go over what their needs are, what the hours that they are requesting [are] and we would just say are you interested in this."[1] (R.R. at 23a-24a.) Ms. Bell testified that if Claimant was not interested in a particular assignment, HNA would "see if there was another one that she might be interested in." (R.R. at 24a.) HNA paid Claimant approximately ten dollars per hour by bi-weekly check. (R.R. at 24a, 27a.)

Ms. Bell testified that clients determined the caregivers' schedules. HNA would get such requests and offer its caregivers the opportunity. (R.R. at 28a.) As to the particular work a caregiver performed, Ms. Bell testified that "[t]he determination [of the duties to perform] would come from the client. We just tell the caregivers what their needs might be, what things they might be needing to be provided, but the client [himself or herself] tells them on a daily basis what they would like them to do." (R.R. at 28a.) Ms. Bell testified that a client may alter an initial request for certain services by a caregiver "as long as [the new work] fell within like what a caregiver is supposed to be doing in general." *Id.* Ms. Bell testified that a client and caregiver may also alter the initial time scheduled "as long as the caregiver agrees on it and they work that out." (R.R. at 28a-29a.)

Ms. Bell explained that HNA provides time sheets to its caregivers to complete and turn in to HNA for the purpose of payment. (R.R. at 29a.) Ms. Bell testified regarding notes at the bottom of one of Claimant's time sheets, indicating

---

[1] Ms. Bell testified that the referrals HNA received were from agencies such as Three Rivers Center for Independent Living, the United Cerebral Palsy, and "some mentally challenged clients, that would be ODP." (R.R. at 24a-25a.)

that she had called another caregiver on a particular date to work Claimant's hours because of an illness. (R.R. at 31a.) Ms. Bell testified that the purpose of the notes was to "notify [HNA] if something went on." (R.R. at 32a.) She indicated that a caregiver does not have to notify HNA first before contacting another caregiver working for HNA to cover a shift. *Id.* Ms. Bell testified that HNA does not provide any training to its caregivers and does not provide materials needed to perform the duties of the job. (R.R. at 35a.) Ms. Bell testified that caregivers use their own cars to take clients to appointments, and that either the client or the caregiver might make such appointments. (R.R. at 35a-36a.)

On cross-examination, Ms. Bell responded to questions concerning the manner by which HNA would address performance issues relating to its caregivers. Ms. Bell testified that she would dismiss caregivers if they were "[b]eing neglectful with the client, just not showing up to work, leaving them alone, stuff like that." (R.R. at 39a.) Ms. Bell testified that the timesheets include a checklist with duties that a client wants a caregiver to perform and the caregiver checks the item to indicate that the job was performed. (R.R. at 40a.) If a caregiver calls off work, HNA requires the worker to submit a doctor's note. (R.R. at 41a.) If something "goes wrong" during a work period, caregivers are required to report an incident to HNA in order for HNA to provide the information to a state-operated "incident management system." *Id.* Ms. Bell agreed that its caregivers further HNA's ability to participate in the services it offers and the business it conducts. (R.R. at 46a.)

Dr. Daoud also testified on behalf of HNA. Dr. Daoud testified regarding a "Home Caregiver Services Policy Procedure Manual" that he co-authored. Dr. Daoud testified that the manual did not include caregivers within

4

the described chain of command. (R.R. at 260a.) In response to a question on cross-examination regarding the purpose of the manual, Dr. Daoud agreed that the chain of command was a means of "encouraging caregivers to speak to secretaries, staff trainers, supervisors, staff coordinators, assistant directors and service directors before they spoke with [him]." (R.R. at 263a.) Dr. Daoud testified that caregivers request to be removed from particular assignments "all the time," but he denied that such caregivers experience negative consequences for making such requests. (R.R. at 262a.)

The WCJ found Claimant's testimony credible only to the extent that it supported HNA's position that HNA was not Claimant's employer. The key factual finding the WCJ made regarding the relationship between HNA and Claimant provides:

> In summary, I find as fact that HNA and [C]laimant had an independent contractor relationship. HNA did not have the right to control [C]laimant's work activities, did not provide [C]laimant with the tools/items she needed to perform her job, and did not supervise her in any manner or set her work hours, and did not train [C]laimant. Furthermore, [C]laimant was able to turn down and terminate clients without retribution, and work for other employers. She was able to have other caregivers substitute for her. HNA did not control [C]laimant while performing services in the clients' homes. Although not dispositive of the issue, [C]laimant signed a contract with HNA that identifies her as an independent contractor, and [C]laimant was aware of the provisions and consequences of the contract. The claim petition must therefore be dismissed.

(Finding of Fact no. 6(E).)

Claimant appealed the WCJ's decision to the Board. The Board concluded that, notwithstanding the WCJ's determination that Claimant's and

5

Ms. Lutz's testimony is not credible, the credited testimony of Ms. Bell and Dr. Daoud is competent and sufficient to support a conclusion that HNA was Claimant's employer and that the WCJ erred as a matter of law in concluding that Claimant was an independent contractor. The Board relied on the following factors: (1) HNA hired Claimant directly, through an interview process which included a background check; (2) HNA gave Claimant specific caregiver assignments, which, at least initially, Claimant did not choose; (3) Claimant was required to keep track of her hours and fill out a timesheet that she provided to HNA; (4) HNA required Claimant to complete incident reports and submit those reports to HNA; (5) HNA had standards that Claimant was required to satisfy or be subjected to termination; (6) HNA required Claimant to call in if sick and provide a doctor's note for such absences; and (7) HNA would provide fill-in services when Claimant called in sick. Based upon these factors, the Board concluded that HNA exercised "control over the manner of Claimant's work." (Board Decision at 7.)

The Board also noted the following elements: (1) Claimant "was not just responsible for results but was a regular employee that provided consistent care for clients that were assigned by [HNA];" (2) Claimant's position "required little skill and was basically light housekeeping for clients;" (3) HNA "did not . . . require any specific certification other than a high school degree;" (4) HNA did not pay on a per-job basis, but rather by bi-weekly pay checks; (5) HNA's "entire business revolved around providing caregivers to clients and caregivers were not ancillary to [HNA's] main business but were, in fact, [its] main business; and (6) HNA "retained the right to terminate caregivers." (Board Decision at 7.)

6

HNA appealed from the Board's order,[2] raising the sole issue of whether the Board erred in reversing the WCJ's order, thereby concluding that Claimant was an employee of HNA. Part of a claimant's burden in a claim petition includes a demonstration that an employment relationship exists. *Universal Am-Can v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000). The question of whether an employment relationship exists is one of law that must be resolved based upon the particular facts in the case. *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 610-11 (Pa. Cmwlth. 2012).

There are many factors a WCJ (as well as the Board and this Court) may consider when attempting to determine whether a claimant is an independent contractor or an employee: (1) control over the manner [by which] the work is done; (2) responsibility for result only; (3) the nature of the work or occupation; (4) skill required for performance; (5) whether one is engaged in a distinct occupation or business; (6) which party supplied the tools or materials; (7) whether payment is by the job or by the time; (8) whether work is part of a regular business of the employer; and (9) whether a right exists to terminate the relationship. *Universal Am-Can*, 762 A.2d at 333.

There is some overlap between these factors. For example, in *Moon Area School District v. Garzony*, 560 A.2d 1361, 1367 (Pa. 1989), our Supreme Court opined that "[i]n an employer-employee relationship, the employer controls the result of the work and has the right to direct the way in which it shall be done, whereas in an owner-independent contractor relationship, the independent

---

[2] Our review in this matter is limited to considering whether the Board erred as a matter of law. 2 Pa. C.S. § 704.

7

contractor has exclusive control over the manner of performing it, being responsible only for the result." *Garzony*, 560 A.2d at 1367-68 (quoting *Feller v. New Amsterdam Cas. Co.*, 70 A.2d 299, 300 (Pa. 1950)). As we have often repeated, no one factor "is in and of itself controlling." *Southland Cable Co. v. Workmen's Comp. Appeal Bd. (Emmett)*, 598 A.2d 329, 331 (Pa. Cmwlth. 1991). Facts tending to show that a worker or putative employer controls the manner by which a worker performs tasks is often the most persuasive indication of whether an employer-employee relationship exists. *Id*. In *Southland*, the putative employer provided the claimant (a cable installer) with a daily list of addresses where he was expected to install cable; the putative employer inspected the claimant's work; employer did not provide tools but did supply materials; employer provided signs with the employer's name and address; employer provided the claimant with an identification badge; and employer provided the claimant with traffic control assistance when necessary. *Id*. Additionally, however, a key element this Court also considered in *Southland* was the fact that the claimant's work for the putative employer was essential to the employer's business. *Id*. We opined that the relative importance of a worker's job to a putative employer's business was related to the question of whether the work at issue is part of the regular business of the putative employer. *Id.* We held that the factors that the WCJ identified in his decision, which we summarize above, were more than adequate to support his determination that an employment relationship existed between the claimant and the cable company. *Id*.

In this matter, the facts the WCJ developed based only on the testimony of HNA's witnesses confirm that it hired Claimant and had the power to terminate her services. There was no testimony indicating that HNA would simply

8

stop assigning work to Claimant if so inclined. Claimant had a duty in certain circumstances to report incidents to HNA, thus suggesting that HNA did control some aspects of Claimant's work responsibilities. HNA developed certain standards with which Claimant was required to comply in order to avoid being terminated. If Claimant called in sick, HNA required her to supply a doctor's note. Claimant's job required no special certification or skills. HNA paid Claimant based upon the number of hours she worked rather than per job. Significantly, as the Board noted, HNA's entire business venture is based upon its supply of caregivers to its clients. Thus, it is quite clear that Claimant's work was critical to the sole purpose of HNA's business.

Accordingly, we conclude that the Board did not err in concluding that HNA was Claimant's employer, and, therefore, we affirm the Board's order.

P. KEVIN BROBSON, Judge

9

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Home Not Alone Caregiver Services,   :
Inc. and Guarantee Insurance Company, :
                      Petitioners   :
                                :
               v.                  :   No. 852 C.D. 2015
                                :
Workers' Compensation Appeal      :
Board (Galore),                    :
                    Respondent   :

# **O R D E R**

AND NOW, this 16th day of December, 2015, the order of the Workers' Compensation Appeal Board is AFFIRMED.

_____
P. KEVIN BROBSON, Judge