IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pittsburgh East Nissan and UPMC : 
Benefit Management Services, Inc., : 
          Petitioners : 
           : 
      v. : No. 1462 C.D. 2019
       : SUBMITTED: February 21, 2020
Workers' Compensation Appeal : 
Board (Rush), : 
          Respondent : 

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                  FILED: May 6, 2020

      Pittsburgh East Nissan (Employer) and UPMC Benefit Management Services, Inc. petition this Court for review of the September 19, 2019 Order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ). The WCJ suspended the wage loss benefits of Larnetta Rush (Claimant) on June 27, 2017, the date Employer terminated Claimant's employment for cause, but ordered these benefits reinstated, effective July 19, 2017, based on her finding that Claimant was once more totally disabled by a work injury. Before this Court, Employer argues that the WCJ capriciously disregarded evidence demonstrating Claimant's wage loss was caused by her termination for cause, not a work-related disability, and that the evidence relied on by the WCJ was incompetent and insufficient to support a reinstatement of Claimant's wage loss benefits. After careful review, we affirm.

# I. Factual Background

Claimant suffered an injury on March 2, 2015, while in the course and scope of her employment as an automobile sales associate, when she slipped on ice in Employer's parking lot and fell, striking her head and back. WCJ Hearing, 9/26/16, at 8. Employer recognized the work injury as a concussion via a Notice of Compensation Payable (NCP). WCJ's Finding of Fact (F.F.) No. 1. On August 31, 2016, Claimant filed a review petition, seeking an expansion of the work injury to include spinal myelopathy and stenosis that resulted in a cervical discectomy and fusion at the C3-4 and C6-7 levels. Certified Record (C.R.), Item No. 2. Claimant also alleged a permanent disfigurement to her neck. *Id.*

On April 12, 2017, Employer filed a petition requesting a suspension of Claimant's wage loss benefits based on her return to full-time duty. C.R., Item No. 5. Claimant denied the allegations and filed a new petition seeking reinstatement of wage loss benefits as well as penalties for Employer's alleged failure to pay such benefits as required. *Id.*, Item No. 9. In its response to Claimant's reinstatement petition, Employer maintained that it continued to pay Claimant's wage loss benefits; however, based on Claimant's subsequent termination from her employment for cause, Employer asserted Claimant was no longer entitled to wage loss benefits. *Id.*, Item No. 14.

In support of her reinstatement and penalty petitions, Claimant testified on her own behalf and presented the deposition testimony of her treating orthopedic surgeon, Dr. Vincent Silvaggio. Employer presented the deposition testimony of its medical expert, Thomas Kramer, M.D.[1]

---

[1] Employer's General Manager, Gary Carr, and Claimant's supervisor, Louis Benaquista, also testified to the circumstances surrounding Claimant's termination for cause. As the issue of

2

## A. Claimant's Evidence

Dr. Silvaggio testified that he initially treated Claimant in 2006, approximately nine years before her March 2, 2015 work injury, when he performed a cervical fusion at the C4-6 levels (2006 fusion). Silvaggio Dep., 11/9/17, at 6, 8. He first examined Claimant for symptoms related to her work injury on July 17, 2015. *Id.* at 5. Claimant presented with neck and arm pain that she attributed to the work injury. *Id.* at 6. Dr. Silvaggio understood Claimant had a good result from the 2006 fusion and he felt the work injury aggravated her underlying preexisting stenosis. *Id.* at 6-7. A magnetic resonance imaging (MRI) study revealed stenosis at the C3-4 and C6-7 levels, above and below Claimant's 2006 fusion. *Id.* at 6. Non-surgical interventions were unsuccessful at treating Claimant's pain symptoms and Dr. Silvaggio performed a discectomy and cervical fusion at the C3-4 and C6-7 levels on March 1, 2016. *Id.* at 8, 25. The complications associated with such a surgery included difficulty with swallowing and speaking. *Id.* at 9. Claimant experienced neck pain and difficulty swallowing throughout the post-operative period. *Id.* at 11-13. Issues with Claimant's voice persisted, as well, which she treated with speech therapy. *Id.* at 20-21.

At a follow-up appointment with Dr. Silvaggio on January 12, 2017, Claimant advised she had difficulty turning her head and she complained of numbness in her upper left extremity. *Id.* at 13. A repeat MRI evidenced the presence of degenerative disease above Claimant's C3-4 fusion. *Id.* X-rays taken on March 8, 2017 indicated one of the screws used for the C6-7 fusion was "backing out," suggesting the C6-7 fusion might fail and require further surgical intervention. *Id.* at 15-16. At that time, Dr. Silvaggio imposed work restrictions that limited Claimant to driving no more

Claimant's termination, or the resultant temporary suspension of her wage loss benefits, is not before the Court, we need not summarize Employer's evidence in that regard.

than three hours per day with breaks permitted for the remaining five hours of her shift. *Id.* at 18, Reproduced Record (R.R.) at 413a. Claimant was further restricted from physical activity such as lifting. *Id.*

The results of an April 2017 computerized tomography (CT) scan of Claimant's cervical spine showed evidence of fusion at the C3-4, C4-5, and C5-6 levels; however, Claimant "clearly" had a nonunion of the fusion at C6-7. *Id.* at Silvaggio Dep. at 20; R.R. at 434a. Dr. Silvaggio restricted Claimant from working entirely as of July 19, 2017, because he felt she had continued to decline from a pain and voice standpoint and "[e]verything was just going in the wrong direction." Silvaggio Dep. at 21, R.R. at 247a. He felt Claimant was headed "down the road" for additional surgery. Silvaggio Dep. at 21.

Dr. Silvaggio ultimately diagnosed Claimant with cervical stenosis above and below the 2006 fusion. *Id.* at 25. This condition was asymptomatic prior to the March 2, 2015 work injury, which caused Claimant's preexisting condition to become symptomatic. *Id.* The difficulties Claimant experienced with swallowing and speaking were a result of her March 1, 2016 cervical fusion, which was itself causally related to the March 2, 2015 work injury. *Id.* at 25-26. Dr. Silvaggio opined that Claimant would continue to require treatment for her chronic neck pain and difficulties with swallowing and speaking. *Id.* at 26-27. He did not believe she was physically capable of returning to her pre-injury job or working in any capacity. *Id.* at 27.

During cross-examination, Dr. Silvaggio acknowledged that Claimant's job duties did not entail heavy manual labor. *Id.* at 30. He had the advantage, however, of observing Claimant over a period of time and witnessed her slow, steady decline. *Id.* at 32. That decline led Dr. Silvaggio to restrict Claimant from working entirely

on July 19, 2017.  *Id.*  Dr. Silvaggio conceded he was not aware that, prior to her termination, Claimant worked hours exceeding the restrictions he imposed in March 2017.  *Id.* at 35.  His medical opinions, however, were unaffected by the knowledge. *Id.* at 41.

Claimant testified over the course of several months at six separate hearings before the WCJ.  R.R. at 32a-246a.[2]  Claimant testified that she continues to have difficulty speaking and her throat "shuts down" if she talks too much.  *Id.* at 42a, 68a.  She must constantly clear her throat to speak and she can no longer sing in her church choir.  *Id.* at 42a.  Claimant's vocal issues impacted her ability to sell cars because "you have to sell yourself first," and she had difficulty finishing conversations with her customers at work.  *Id.* at 69a.  Claimant would have to excuse herself while in the middle of a sale and "relax for a few minutes" before she could continue speaking.  *Id.*  Claimant acknowledged that the length of her shifts at times exceeded the restrictions imposed by Dr. Silvaggio.  *Id.* at 74a.  Claimant explained that if a customer arrived at the end of her shift, she had to remain and finish the sale.  *Id.*  If Claimant left, another associate would get credit for the sale. *Id.* at 75a.

During cross-examination, Claimant agreed that she was no longer working because she was terminated.  *Id.* at 126a.  However, she did not apply for any other jobs because Dr. Silvaggio had not released her to work.  *Id.* at 140a.  Claimant testified that she has a harder time talking and food gets stuck in her throat when she eats.  *Id.* at 141a.  She asserted, however, that "once I get all that taken care of I would like to get back – I like what I did . . . . I want to work."  *Id.*

---

[2] Claimant testified at hearings before the WCJ on September 26, 2016, April 18, 2017, August 7, 2017, October 10, 2017, December 5, 2017, and February 14, 2018.

## B. Employer's Evidence

Dr. Kramer, an orthopedic surgeon, performed independent medical examinations (IME) of Claimant on February 26, 2016 and February 13, 2017. Kramer Dep., 9/13/17, at 7. Dr. Kramer agreed that Claimant's work injury aggravated a preexisting degenerative condition above and below the level of her 2006 fusion, resulting in the development of cervical myelopathy. *Id.* at 10, 21. Dr. Kramer also agreed the surgery performed by Dr. Silvaggio was medically appropriate and necessary and related to the work injury. *Id*. at 10. During the February 13, 2017 IME, Claimant rated the pain in her neck as an 8-9 out of 10 and complained of numbness and tingling in her left arm, which she had difficulty lifting at times. *Id.* at 11-12. Dr. Kramer did not believe Claimant's subjective complaints of pain were supported by the results of his clinical examination. *Id.* at 11. Dr. Kramer likewise found no objective evidence to support Claimant's report of numbness in her left arm. *Id.* at 14. He opined that any limitations with Claimant's range of motion were consistent with a "four-level fusion." *Id.*

With regard to Claimant's ability to speak, Dr. Kramer found no evidence that Claimant suffered any type of injury to her laryngeal nerves. *Id.* at 15. He stated that any swallowing difficulties Claimant encountered were not unusual for a patient who underwent two separate spine surgeries. *Id.* Dr. Kramer opined that, as of February 13, 2017, the date of the second IME, Claimant had reached maximum medical improvement with regard to the work injury and he recommended no further treatment. *Id.* at 13-14. Dr. Kramer disagreed with Dr. Silvaggio's recommendation that Claimant could not work in any capacity. *Id.* at 18. While Dr. Kramer agreed Claimant had not fully recovered from her work injury, he opined that she could return to her pre-injury job duties without restriction. *Id.* at 14-15, 18.

6

During cross-examination, Dr. Kramer acknowledged that Claimant had developed difficulties with swallowing and speaking, and those risks are associated with the fusion surgery performed by Dr. Silvaggio. *Id.* at 24-25. Dr. Kramer admitted that patients with cervical myelopathy can experience symptoms such as weakness, numbness, and nerve pain down the arms that do not improve with time. *Id.* at 22, 26. He further admitted that Claimant would likely continue to have symptoms related to the work injury and would never fully recover. *Id.* at 27. Additionally, while Dr. Kramer would not recommend further surgery based on his review of Claimant's medical records, he agreed surgical intervention might be required to correct a nonunion of Claimant's fusion surgery, as it appeared one screw "may be backing out," or to treat Claimant's swallowing difficulties. *Id.* at 29-30.

### C. WCJ's Decision

In a decision circulated on June 29, 2018, the WCJ found that Claimant sustained a work injury on March 2, 2015. WCJ's F.F. No. 9(a). The WCJ expanded the description of Claimant's work injury to include spinal myelopathy and an aggravation of preexisting stenosis that required a cervical discectomy and fusion at the C3-4 and C6-7 levels. *Id.* Claimant's fusion surgery resulted in permanent scarring and disfigurement on the left side of her neck. *Id.*

The WCJ found that Claimant was able to return to her pre-injury position as a sales associate, with restrictions, until June 26, 2017, at which time Claimant was terminated for cause. *Id.* No. 9(b). As Claimant's loss of earnings after June 26, 2017, was not caused by her work injury, Employer was entitled to a suspension of Claimant's wage loss benefits as of that date. *Id.* Based on the opinion of Dr. Silvaggio, which the WCJ accepted as credible, Claimant was once more totally disabled as of July 19, 2017. *Id.* No. 9(c).

7

The WCJ found Claimant's testimony credible and persuasive as to her physical decline, continued pain, and difficulty with speaking and swallowing, as that testimony was supported by the opinions of Dr. Silvaggio. *Id.* No. 9(d). However, the WCJ rejected Claimant's testimony with respect to the events that led to her termination on June 26, 2017. *Id.* The WCJ based her credibility determination in part on Claimant's demeanor while testifying. *Id.*

The WCJ found the opinions of Dr. Silvaggio more credible and persuasive than those of Dr. Kramer, as Dr. Silvaggio was Claimant's treating surgeon and he examined Claimant on multiple occasions. *Id.* No. 9(f). Moreover, Dr. Silvaggio treated Claimant prior to and following the work injury, which allowed him to observe Claimant's physical decline over time to the point that he felt it necessary to remove Claimant from working in any capacity on July 19, 2017. *Id.* Dr. Kramer conceded Claimant had not fully recovered from the work injury and additional surgeries might be required to address her neck complaints and swallowing difficulties. *Id.* Otherwise, the WCJ rejected Dr. Kramer's opinions to the extent they conflicted with those of Dr. Silvaggio. *Id.*

Accordingly, the WCJ granted Claimant's review petition, expanding the description of her work injury and ordering the payment of additional compensation for Claimant's disfigurement. WCJ's Decision, 6/29/18, at 13. The WCJ granted Employer's suspension petition as of June 26, 2017, the date Claimant was terminated for cause, through July 19, 2017, at which time Claimant's wage loss benefits were reinstated, as she was once more totally disabled by her work injury. *Id.* The WCJ dismissed Claimant's penalty petition as moot, as Employer continued to pay Claimant's wage loss benefits. *Id.*

8

## D. Board's Decision

Employer appealed the reinstatement of Claimant's wage loss benefits to the Board, arguing that the WCJ capriciously disregarded evidence and relied on incompetent and equivocal testimony in granting reinstatement. The Board affirmed the WCJ, as the reinstatement of Claimant's benefits was based on the credible testimony of Claimant and Dr. Silvaggio, and the WCJ had sole authority over questions of credibility, conflicting medical evidence, and evidentiary weight. Bd. Op. at 7. The Board noted that Dr. Silvaggio's decision to restrict Claimant from working entirely was not based on an understanding of the number of hours she worked each week, but rather due to the steady deterioration of her condition. *Id.* at 7-8. Finally, given that the WCJ temporarily suspended Claimant's benefits based on her termination for cause, the Board disagreed that the WCJ capriciously disregarded evidence relating to the cause of Claimant's wage loss. *Id.* at 8. This appeal followed.

## II. Issues

On appeal,[3] Employer argues that: (1) the WCJ capriciously disregarded evidence establishing that Claimant's loss of income was caused by her termination for cause and not a physical disability; and (2) the testimony of Claimant's medical expert was incompetent and insufficient to support the WCJ's finding that Claimant's medical condition had worsened.

---

[3] Our review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 331 n.2 (Pa. 2000).

## III. Discussion

## A. Capricious Disregard

First, Employer argues the WCJ erred in reinstating Claimant's wage loss benefits because Claimant's loss of earning power was solely based on her termination for cause, not the work injury. Employer asserts that, by reinstating Claimant's wage loss benefits as of July 19, 2017, the WCJ capriciously disregarded competent evidence – including Claimant's own testimony – that established she was physically capable of returning to work, but for the termination of her employment.

A capricious disregard of evidence occurs when the WCJ deliberately and baselessly disregards evidence that is apparently trustworthy. *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). Where substantial evidence exists to support an agency's factual findings, and those findings in turn support the conclusions, it should remain a *rare* instance in which an appellate court disturbs an adjudication based upon capricious disregard of the evidence. *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 n.14 (Pa. 2002). The fact that a WCJ may not specifically discuss a particular line or portion of testimony does not constitute a capricious disregard thereof, and a WCJ is not required to accept even uncontradicted testimony. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.- Fairless Workers and USX Corp.)*, 862 A.2d 137, 144-46 (Pa. Cmwlth. 2004).

Employer cites the following testimony from the October 10, 2017 hearing before the WCJ as evidence that Claimant was capable of returning to work, but for her termination for cause:

10

> [Employer's Counsel]:    [W]ould you agree with me that from a physical standpoint in light of your work injury, you could be selling cars right now, if you weren't terminated.  Do you agree with that?
>
> [Claimant]:  Yes.
>
> [Employer's Counsel]:    And the reason, in fact, you're not working is because of the termination?
>
> [Claimant]:  Yes, sir.

R.R. at 125a-26a.

Additionally, Employer cites Claimant's testimony from the February 12, 2018 hearing as evidencing her ability to work:

> [Employer's Counsel]:    [I]s it still your testimony that had you not been terminated, you could still be selling cars right now?
>
> [Claimant]: You're right.  I want my job.  I like what I did.

*Id.* at 242a.

While Employer has not mischaracterized Claimant's testimony, Employer neglects to recognize Claimant initially testified at the October 10, 2017 hearing that she had not applied for any jobs at that time specifically because she had not been released to work by Dr. Silvaggio.  Claimant testified:

> I have to wait until my doctor releases me.  I don't want to go to another job and my doctor hasn't released me . . . .  I want to make sure that I'm healthy.  I'm doing therapy and everything.  So, once I get all that taken care of I would like to get back – I like what I did.

11

*Id.* at 140a. Similarly, at the February 12, 2018 hearing, which primarily concerned the for-cause nature of Claimant's termination, Claimant testified that Dr. Silvaggio had not released her to work. *Id.* at 224a.

While we recognize that the WCJ did not reiterate the testimony cited above in her decision, we cannot conclude that her failure to do so constitutes a capricious disregard of evidence. The WCJ thoroughly summarized the testimony presented by both Claimant and Employer, but she was not required to address every line of testimony. *Williams*, 862 A.2d at 146. Indeed, it is hard to fathom how she could have, as the transcripts from the six hearings at which Claimant testified cover more than 200 pages of testimony.

As noted, a capricious disregard of evidence occurs when the WCJ deliberately and baselessly disregards evidence that is "apparently trustworthy." *Amandeo*, 37 A.3d at 80. Having reviewed the hearing transcripts in full, we cannot say that the testimony favored by Employer is any more trustworthy than that which it contradicts. Moreover, in finding that Claimant was once more totally disabled, the WCJ relied not on the testimony cited above, but on the credible opinions of Dr. Silvaggio. WCJ's F.F. No. 9(c). Claimant's testimony regarding her continued pain and difficulty with swallowing and speaking was credited solely because it was corroborated by the opinions of Dr. Silvaggio. *Id.* No. 9(d). The remainder of her testimony, including that cited above, was rejected. *Id.*

The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). In executing her role as factfinder, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* A WCJ's credibility determinations are due substantial deference and may only be

12

overturned if they are "arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render [them] irrational." *Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008).

Given the apparent inconsistencies in Claimant's testimony, as demonstrated above, we cannot conclude the WCJ's rejection thereof constituted capricious disregard. Nor can we conclude that any of the WCJ's credibility determinations that failed to consider this testimony were arbitrary, capricious, or fundamentally dependent on a misapprehension of material facts.

## B. Competency of Medical Opinion

Next, Employer argues that Dr. Silvaggio's opinion that Claimant's condition had worsened was not competent because he was unaware of the hours Claimant worked before her termination. As such, he did not have a complete grasp of Claimant's physical capabilities and capacity to work before and after July 19, 2017. Claimant's inability to continue working for Employer was based solely on her termination for cause. Accordingly, Employer argues, Claimant could not meet the burden of proof required to support a reinstatement of her wage loss benefits.

A claimant seeking reinstatement of suspended benefits must prove that her earning power is once again adversely affected by her disability, and that such disability is a continuation of that which arose from her original claim. *Bufford v. Workers' Comp. Appeal Bd. (N. Am. Telecom)*, 2 A.3d 548, 558 (Pa. 2010). The question of whether expert medical testimony is unequivocal and, thus, competent evidence to support a WCJ's factual determinations is a question of law subject to our review. *Amandeo*, 37 A.3d at 80. "A medical expert's opinion is not rendered incompetent unless it is *solely* based on inaccurate or false information." *Am.*

13

*Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001) (emphasis in original). Further, the opinion of a medical expert must be viewed *as a whole. Id.* Inaccurate information will not defeat an expert's opinion unless it is dependent on those inaccuracies. *Id.*

In finding Claimant was once more totally disabled by her work injury, the WCJ relied on the testimony of both Dr. Silvaggio and Claimant that her condition had worsened. WCJ's F.F. Nos. 9(d), (f). With regard to Dr. Silvaggio, the WCJ found his testimony credible in part due to his status as Claimant's treating physician both prior to and following her work injury. *Id.* No. 9(f). The WCJ was further persuaded by Dr. Silvaggio's "logical and concrete explanation" of Claimant's decline over time. *Id.* The WCJ noted that Dr. Kramer, Employer's expert, agreed that Claimant had not recovered from her work injury and she might require additional surgery. *Id.* As to Employer's assertion that Dr. Silvaggio did not have a complete grasp of Claimant's physical capabilities, Dr. Silvaggio acknowledged during cross-examination that he was not aware Claimant worked hours in excess of the work restrictions he imposed in March 2017. Silvaggio Dep. at 35. He did not, however, recant his prior testimony or opinions. Rather, when asked if his opinions regarding Claimant's medical condition and inability to work in any capacity had changed based on this information, Dr. Silvaggio unequivocally answered they had not. *Id.* at 41.

Our review of Dr. Silvaggio's testimony reveals that his opinions *as a whole* were based on the treatment he provided Claimant over the course of several years and his observation that she had declined from a pain and voice standpoint, not on his understanding – however accurate – of the hours Claimant worked prior to her

14

termination. Consequently, we cannot agree with Employer that Dr. Silvaggio's opinions were incompetent to support the WCJ's factual determinations.

### C. Substantial Evidence

Employer's final argument that the WCJ's findings of fact were unsupported by substantial evidence is primarily based on Claimant's October 10, 2017 and February 12, 2018 testimony that, but for her termination, she would have continued to sell cars. Employer contends that the record otherwise fails to demonstrate Claimant's condition declined to the point that she was no longer capable of working, effective July 19, 2017.

As previously stated, the WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Lindemuth*, 134 A.3d at 125. In executing her role as factfinder, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* It is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the inquiry before this Court is whether evidence exists to support the findings actually made. *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *City of Philadelphia v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011).

The WCJ found credible Claimant's testimony regarding her physical decline, continued pain, and difficulty with speaking and swallowing, as that testimony was supported by the credible opinions of Dr. Silvaggio. WCJ's F.F. No. 9(d). We are bound by the WCJ's credibility determinations. *Minicozzi*, 873 A.2d at 29. Dr. Silvaggio's opinion that Claimant had declined was based on his continued treatment of Claimant over the course of time. Silvaggio Dep. at 32; WCJ's F.F. No. 9(f). Dr.

15

Silvaggio's office records document that he examined Claimant on seven occasions in 2017 before restricting her from working in any capacity. R.R. at 384a, 392a, 401a, 421a, 433a, 441a. While these records do not evidence a dramatic decline in Claimant's condition, they do demonstrate a decline over time.

In January 12, 2017, Claimant reported neck pain, numbness in her left arm, difficulty moving her head, and continued issues with swallowing and speaking. R.R. at 384a-85a. Dr. Silvaggio's March 8, 2017 office note reflects that an X-ray of Claimant's cervical spine showed "loosening and fairly significant back out of one of her screws at C7." *Id.* at 400a-01a. Approximately two months later, in a May 18, 2017 office note, Dr. Silvaggio indicated that the results of an April 2017 CT scan revealed a nonunion of Claimant's fusion at the C6-7 levels. *Id.* at 434a. In addition to her prior symptoms, Claimant complained at a June 7, 2017 visit that her throat felt "inflamed and swollen," and by July 19, 2017, she reported being "absolutely miserable." *Id.* at 441a, 450a. Claimant, who is 5'5" tall, lost 10 pounds between January 12, 2017, and July 19, 2017, her weight dropping from 130 to 120 pounds. R.R. at 388a, 451a. By July 19, 2017, Dr. Silvaggio's observations of Claimant's decline led him to conclude she was "done now working." Silvaggio Dep. at 32.

To succeed with her reinstatement petition, Claimant had to demonstrate that her earning power was once again adversely affected by her disability, and that her disability was a continuation of that which arose from her original claim. Employer does not dispute that Claimant's continued symptoms are related to her work injury but merely maintains that her termination from employment, and not her work injury, caused her loss of earnings. It is of no moment that Dr. Kramer's testimony could support a finding that Claimant's condition had not worsened, because the

16

inquiry before this Court is whether the record supports the findings actually made by the WCJ. Having reviewed the record as a whole, we conclude that the WCJ's finding that Claimant's work injury rendered her disabled, effective July 19, 2017, is amply supported by the evidence presented.

## IV. Conclusion

In sum, we conclude that the WCJ did not capriciously disregard competent evidence and that the WCJ's findings of fact that led to a reinstatement of Claimant's wage loss benefits are supported by the competent testimony of both Claimant and Dr. Silvaggio. Accordingly, we affirm the Board's Order.

_____

ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pittsburgh East Nissan and UPMC   :
Benefit Management Services, Inc.,   :
              Petitioners   :
                 :
       v.   :   No. 1462 C.D. 2019
                 :
Workers' Compensation Appeal   :
Board (Rush),   :
              Respondent   :

# **O R D E R**


AND NOW, this 6th day of May, 2020, the September 19, 2019 Order of the Workers' Compensation Appeal Board is hereby affirmed.


_____
ELLEN CEISLER, Judge