762 A.2d 328

**UNIVERSAL AM–CAN, LTD. and National Union/AIAC, Appellants,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (Clarence O. MINTEER), Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 13, 1999.

Decided Nov. 27, 2000.

482

Paul S. Mazeski, Pittsburgh, for Universal Am-Can, Ltd.

Mark Gordon, Pittsburgh, Michael A. Cohen, Philadelphia, Robert J. Goduto, Harrisburg, amici curiae.

John W. McTiernan, Daniel K. Bricmont, Pittsburgh, for Clarence Minteer.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

The sole issue in this appeal is whether Claimant Clarence O. Minteer was an employee, or an independent contractor, of Appellant Universal Am–Can, Ltd. for the purposes of the Pennsylvania Workers' Compensation Act. For the reasons that follow, we determine that Minteer was an independent contractor. Thus, we reverse the order of the Commonwealth Court.

Minteer is an owner-operator of a tractor-trailer unit. Pursuant to an operating agreement, Minteer's tractor-trailer was under lease to Universal Am–Can. On April 16, 1993, Minteer fell from his truck while attempting to secure a tarp that covered his shipment. As a result of the fall, Minteer sustained serious injuries to his right arm, left wrist, and left leg. Minteer filed a claim petition under the Pennsylvania Workers' Compensation Act [1] on June 15, 1993, alleging that he became fully disabled because of these injuries. Universal Am–Can denied the allegations, specifically contending that Minteer was an independent contractor at the time of his injuries.

In addressing the issue of employee status, the workers' compensation judge concluded that Minteer had met his burden of establishing that he was an employee of Universal Am–Can at the time of the injury. Critical to the WCJ's decision was the finding that, to a significant degree, Universal Am–Can controlled Minteer's work. Thus, Minteer's petition was granted and Universal Am–Can was ordered to pay Minteer disability benefits.

The Workers' Compensation Appeal Board (Board) affirmed the decision of the workers' compensation judge on appeal. The Board opined that the key elements in determining employee status are whether the alleged employer has the right to control the work to be done and the manner in which it is performed. In affirming the WCJ's decision, the Board found that the facts indicating that Minteer's work was controlled to a large degree by Universal Am–Can were supported by substantial evidence. Thus, the Board too found Minteer to be an employee of Universal Am–Can.

On appeal, a unanimous panel of the Commonwealth Court affirmed. Without so stating, the court upheld the decision of the Board on two distinct bases. First, as did the workers' compensation judge and the Board below, the Commonwealth Court considered certain common-law factors traditionally used in considering employee status. Consistent with the

1. Act of June 2, 1915, PL 736, as amended, 77 P.S. §§ 1–1041.4.

Board's analysis, the Commonwealth Court noted that while all factors are important, the most persuasive indicator of a claimant's employee or independent contractor status lies in the right to control either the work to be done or the manner in which the work is to be accomplished, citing *Lynch v. WCAB (Connellsville Area School District)*, 123 Pa.Cmwlth. 299, 554 A.2d 159 (1989). The Commonwealth Court concluded that in this case, Universal Am–Can had the right to control and to supervise the manner and method by which Minteer hauled cargo and completed his deliveries. However, the court went further in its decision and also conducted an analysis of federal and state regulations; the court concluded that these regulations predetermined Minteer's status as an employee of Universal Am–Can. In fact, the Commonwealth Court found that certain regulations regarding the use of a carrier's insignia upon the tractor-trailer create an "irrebuttable presumption" of employee status. Thus, the Commonwealth Court affirmed the order of the Board finding an employer/employee relationship between Universal Am–Can and Minteer.

We granted allocatur to review the legal analysis utilized by the Commonwealth Court in determining whether Minteer was an employee or independent contractor for purposes of the Workers' Compensation Act.

An independent contractor is not entitled to benefits because of the absence of a master/servant relationship. 77 P.S. § 21; 77 P.S. § 22; *Cox v. Caeti*, 444 Pa. 143, 279 A.2d 756, 757 (1971). Thus, employee or independent contractor status is a crucial threshold determination that must be made before granting workers' compensation benefits. It is a claimant's burden to establish an employer/employee relationship in order to receive benefits. *Johnson v. WCAB (Dubois Courier Express)*, 158 Pa.Cmwlth. 76, 631 A.2d 693, 695 (1993). Although it is a claimant's burden to demonstrate an employer/employee relationship, our court has decided that "neither the compensation authorities nor the courts should be solicitous to find contractorship rather than employment, and that inferences favoring the claim need make only slightly stronger

appeal to reason than those opposed." *Diehl v. Keystone Alloys Co.*, 398 Pa. 56, 156 A.2d 818, 820 (1959); *see also Southland Cable v. WCAB (Emmett)*, 142 Pa.Cmwlth. 612, 598 A.2d 329, 331 (1991). Moreover, a determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case. *JFC Temps, Inc. v. WCAB (Lindsay and G & B Packing)*, 545 Pa. 149, 680 A.2d 862, 864 (1996).

 We will first address Universal Am–Can's contention that the Commonwealth Court erred in its finding that federal and state regulations mandate a finding of employee status and that an "irrebuttable presumption" of employee status is created when a driver places the carrier's insignia on his or her vehicle. We will then consider Universal Am–Can's argument that the evidence of record failed to establish that Universal Am–Can exercised the requisite degree of control necessary to create an employer/employee relationship under common law principles.[2]

In support of its finding that Minteer was an employee, the Commonwealth Court found that Universal Am–Can leased vehicles for use in its hauling business and operated under both Interstate Commerce Commission (ICC) and Pennsylvania Department of Transportation (DOT) permits. In order for Minteer to operate under Universal Am–Can's ICC and DOT permits, Minteer and Universal Am–Can were required to enter into a Contractor Operating Agreement. By the

2. Appellate review in workers' compensation proceedings is limited to determining whether constitutional rights have been violated, an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board*, 536 Pa. 335, 639 A.2d 453 (1994).

 As this appeal deals with a question of law, the scope of review in this matter is plenary, *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995), i.e., a broad scope of review. The Administrative Agency Law provides that the reviewing court "shall hear the appeal without a jury on the record certified by the Commonwealth agency." 2 Pa.C.S. § 704. Thus, in this appeal, we are required to examine the entire record made before the administrative agency, including the evidence that detracts from the agency's decision. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383, 1387 (1985).

terms of this agreement, and pursuant to federal regulations, Universal Am–Can, as a motor carrier operating pursuant to an ICC permit, was required to maintain exclusive possession, control and use of its leased vehicles. 49 C.F.R. § 376.12(c)(1). Similarly, the Commonwealth Court opined that Pennsylvania law confers the same possession, control, and use responsibility upon a carrier lessee operating equipment under a DOT permit. 52 Pa.Code § 31.32(c)(2)(iv)(A).

■ Universal Am–Can contends that the Commonwealth Court erred in this statutory analysis which led the court to find an employer/employee relationship. Contrary to the Commonwealth Court's finding that the federal regulation regarding exclusive possession, control, and use of the equipment is dispositive, Universal Am–Can offers a different regulation, not addressed by the Commonwealth Court, which renders this basis for requiring a conclusion of an employer/employee relationship nugatory. Universal Am–Can aptly points to 49 C.F.R. § 376.12(c)(4) which provides that:

Nothing in the provisions of paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier complies with 49 U.S.C. 11107 and the attendant administrative requirements.

Simply stated, we agree with Universal Am–Can that based upon the unequivocal language contained in § 376.12(c)(4), the regulation found at § 376.12(c)(1), relating to possession, control, and use does not mandate a determination of employee status.

■ The Pennsylvania DOT regulation regarding operation of motor vehicles echoes its federal counterpart. 52 Pa.Code § 31.32(c)(2)(iv)(A). Although the Pennsylvania regulation does not contain a provision such as that found in 49 CFR § 376.12(c)(4), after review of the Pennsylvania regulation relied upon by the Commonwealth Court to determine employee status, we believe that this state regulation was not intend-

ed to be dispositive as to employee/independent contractor status for workers' compensation purposes.

As a final aspect of its statutory analysis, the Commonwealth Court looked to 49 C.F.R. § 376.11(c) and found that this regulation mandates identification of the leased vehicle in the carrier's service by displaying the name of the carrier and the ICC permit number on the vehicle. The Commonwealth Court, seizing on this regulation, concluded that Minteer's display of Universal Am–Can's insignia and ICC and DOT permits on the outside of his truck established an "irrebuttable presumption" of an employment relationship between Universal Am–Can and Minteer, citing *Carolina Casualty Insurance Company v. Insurance Company of North America*, 595 F.2d 128, 137 n. 29 (3rd Cir.1979).

Universal Am–Can faults the Commonwealth Court's reliance upon this regulation and upon *Carolina Casualty* for the proposition that an "irrebuttable presumption" of employment status is created when a driver displays a motor carrier's insignia. According to Universal Am–Can, *Carolina Casualty* is inapposite to this matter. Again, we agree.

In *Carolina Casualty*, the Court of Appeals for the Third Circuit stated that federal law, in effect, creates an "irrebuttable presumption" of an employment relationship between the driver and a motor carrier lessee whose placards identify the vehicle. However, *Carolina Casualty* arose in the context of a dispute between insurance carriers who were allegedly responsible for the payment of damages to an injured plaintiff as a result of an accident between the injured plaintiff and a driver/operator operating a tractor trailer wherein the lessor of the tractor-trailer and the motor carrier lessee were held jointly and severally liable for the accident involving the leased vehicle. As noted by Universal Am–Can, this case did not involve a claim brought by a driver against his alleged employer seeking workers' compensation benefits.

■ We concur with Universal Am–Can that reliance upon *Carolina Casualty* and the creation of an "irrebuttable presumption" is inappropriate in this case. *Carolina Casualty*

and similar cases deal with a motor carrier's liability under leasing regulations to shippers and the public and not with the employment relationship between owner-operators and motor carriers. The presence of a carrier's insignia on the outside of a rig is merely one of the many factors to be considered when determining employee/independent contractor status and does not command a conclusion of employee status.

In sum, we hold that the Commonwealth Court erred in finding that federal and state regulations *mandate* a finding of employee status. *Kelly v. Walton*, 6 Pa.Cmwlth. 236, 293 A.2d 627, 629–31 (1972) (ICC regulations do not compel determination of employment status). Rather, compliance with these regulations is merely a factor that may be considered in a common law analysis of employee status.

Having concluded that the Commonwealth Court erroneously found that federal and state regulations require a finding of employee status, we must determine whether the result reached by the Commonwealth Court should be affirmed on other grounds. After consideration of the common law factors relevant to a determination of employee/independent contractor status, we believe that Minteer failed to establish that he was an employee for purposes of the Workers' Compensation Act.

In determining employee or independent contractor status, certain criteria have come to serve as guideposts for the reviewing tribunal. Both parties correctly point to this court's decision in *Hammermill Paper Company v. Rust Engineering Company*, 430 Pa. 365, 243 A.2d 389, 392 (1968), as setting forth the relevant factors in undertaking this analysis.

In *Hammermill Paper*, this court set forth the following indicia to be considered when determining employee/independent contractor status:

> While no hard and fast rule exists to determine whether a particular relationship is that of employer-employee or owner-independent contractor, certain guidelines have been established and certain factors are required to be taken into consideration:

"Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time." *Stepp v. Renn,* 184 Pa. Superior Ct. 634, 637, 135 A.2d 794 (1957). See also: *Hader v. Coplay Cement Mfg. Co.,* 410 Pa. 139, 150, 189 A.2d 271 (1963).

*Hammermill Paper,* 243 A.2d at 392.

■■■ Whether some or all of these factors exist in any given situation is not controlling. *J. Miller Co. v. Mixter,* 2 Pa.Cmwlth. 229, 277 A.2d 867 (1971). Further, while each factor is relevant, there are certain guidelines that have been elevated to be dominant considerations. The parties agree, and our case law confirms, that control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status. *See, JFC Temps, Inc. v. WCAB (Lindsay and G & B Packing),* 545 Pa. 149, 680 A.2d 862 (1996); *Mature v. Angelo,* 373 Pa. 593, 97 A.2d 59, 60 (1953); *Northern Central Bank and Trust Co. v. WCAB (Kontz),* 88 Pa.Cmwlth. 277, 489 A.2d 274 (1985); *North Penn Transfer, Inc. v. WCAB,* 61 Pa.Cmwlth. 469, 434 A.2d 228 (1981). Moreover, it is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised. *See Mature v. Angelo; Johnson v. WCAB (Dubois Courier Express),* 158 Pa.Cmwlth. 76, 631 A.2d 693 (1993). With these parameters in mind, we turn to Universal Am–Can's argument that the Commonwealth Court erred in finding Minteer to be its employee for purposes of the Workers' Compensation Act.

■■■ Universal Am–Can contends that Minteer failed to establish that he was an employee because the evidence of record does not support the WCJ's conclusion that Universal Am–Can exercised, or had the right to exercise, the requisite

degree of control over the work to be done by Minteer and the manner of performance. We agree.

In resolving the issue of Minteer's status, the WCJ identified the following findings of fact as relevant to his determination:

(1) Mr. Minteer was the owner of the tractor-trailer unit which he was operating at the time of his injury.

(2) When he was injured, Mr. Minteer was hauling cargo for the defendant.

(3) Mr. Minteer and the Defendant entered into a Contractor Operating Agreement on February 5, 1993 (Defendant Exhibit A). Through this Agreement, Mr. Minteer leased his tractor-trailer unit to the Defendant.

(4) By the Contractor Operating Agreement the Defendant took exclusive control of Mr. Minteer's tractor-trailer unit.

(5) Mr. Minteer was required to place the Defendant's identification insignia on his truck.

(6) Although Mr. Minteer had a right to haul cargo for others, this right was severely restricted by the terms of the contract. He could exercise this right only if the Defendant had no cargo to haul and only with the permission of the Defendant.

(7) Mr. Minteer was required to contact the Defendant's dispatcher by telephone every 12 or 24 hours, depending on the load (Driver's manual, Employee Exhibit 4).

(8) Although Mr. Minteer was responsible for maintenance and fueling of his tractor-trailer unit, the Defendant's driver regulations include requirements for mandatory inspections, for observing speed limits, and for covering loads with tarps.

(9) The Defendant's driver's manual includes a provision which relieves the driver of all duty and responsibility as to the vehicle and cargo when "off duty" while making the mandatory one hour stop for meals. This provision implies control by the Defendant during on duty work hours.

(10) Although Section 7A of the Contractor Operating Agreement apparently makes Mr. Minteer fully responsible for hiring, firing and directing drivers of his tractor-trailer, this responsibility is essentially controlled by the Employer by the Agreement section 7F which requires Defendant approval of all drivers and by the numerous regulations and requirements contained in its driver's manual.

(11) Mr. Minteer chose his travel routes without direction from the Defendant.

WCJ's decision, Finding of Fact No. 8.

Based upon these specific findings, the WCJ determined that Minteer's work was controlled to a large degree by Universal Am–Can. The WCJ found that Universal Am–Can controlled the essential elements of Minteer's work through the Contractor Operating Agreement and its driver's manual. The WCJ also found that Minteer's right to refuse an assignment, to choose his travel routes, and his obligations to maintain and fuel his tractor-trailer were not sufficient to make him independent of control by Universal Am–Can. The WCJ concluded that this control of Minteer's work made him an employee of Universal Am–Can at the time of the injury.

We agree with Universal Am–Can that these factors are insufficient to establish that Minteer was an employee of the company. The factors specified by the WCJ in reaching that conclusion are for the most part governed by federal regulations. Because a motor carrier has no ability to negotiate aspects of the operation of leased equipment that are regulated, these factors may not be considered in resolving whether an owner-operator is an independent contractor or employee.[3]

---

**3.** The dissent offers several factors as support for its conclusion that Minteer was not an independent contractor. It is evident that the dissent views the Contractor Operating Agreement as onerous to Minteer because provisions of that agreement do not favor him only.

The negotiated terms of the Contractor Operating Agreement were designed to compensate Minteer for his performance and the use of his equipment. The financial incentives and disincentives were designed to encourage the efficient operation of Universal Am–Can's business. This reflects that the hauling of freight is intended to profit both motor

In applying the traditional test for determining whether a workers' compensation claimant is an independent contractor or employee, we must consider control over the work to be completed and means of performance. Factors which demonstrate compliance with government regulations do not assist in the application of the test. The existence of the regulations precludes a motor carrier and an owner-operator of leased equipment from negotiating any terms subject to the regulations. Neither party has bargaining power, or the ability to control the work to be done, when dealing with matters subject to regulation.

The extensive federal and state regulation of motor carriers is intended to protect the public. "Safety in motor vehicle operation ... was an important concern of the [Interstate Commerce Commission] in its development of the equipment-leasing regulations." *American Trucking Assns. v. United States*, 344 U.S. 298, 305, 73 S.Ct. 307, 97 L.Ed. 337 (1953).

In *North American Van Lines, Inc. v. National Labor Relations Board*, 276 U.S.App.D.C. 158, 869 F.2d 596 (1989), the U.S. Court of Appeals for the District of Columbia Circuit analyzed the impact of federal regulation on the status of truck drivers as independent contractors or employees. The issue before the court was whether a determination of the National Labor Relations Board that North American Van Lines, Inc. had committed an unfair labor practice should be set aside as exceeding the NLRB's jurisdiction. The company argued that the drivers were independent contractors rather than employees, and that the NLRB's jurisdiction extended only to employees. The court concluded that the drivers were independent contractors and that the NLRB lacked jurisdiction over the matter.

In reaching this conclusion, the court utilized a "right to control" test. The court stated that "[t]he test requires an evaluation of all circumstances, but 'the extent of the actual supervision exercised by a putative employer over the means

carrier and owner-operator. We cannot conclude that the existence of a profit motive of a business converts the relationship of carrier/owner-operator to employer/employee.

and manner of the workers' performance is the most important element to be considered in determining whether or not one is dealing with independent contractors or employees.' " 869 F.2d at 599 (citations omitted). Although the issue before the court did not involve a workers' compensation claim, the relevant inquiry focused, as we do, on control over the manner and means of the truck drivers' performance.

The court stated,

> [R]estrictions upon a workers' [sic] manner and means of performance that spring from government regulation (rather than company initiatives) do not necessarily support a conclusion of employment status. Indeed, employer efforts to ensure the workers' compliance with government regulations, even when those efforts restrict the manner and means of performance, do not weigh in favor of employee status. "The employer cannot evade the law ... and in requiring compliance with the law he is not controlling the driver. It is the law that controls the driver."

869 F.2d at 599 (citations omitted). See also, *National Trailer Convoy, Inc. v. Employment Security Agency of Idaho,* 83 Idaho 247, 360 P.2d 994, 996 (1961) ("Requirements that truck and driver meet Interstate Commerce Commission standards ... point toward compliance with governmental regulations, and are not indicia of an employer-employee relationship.")

In this case, the factors offered as support for Minteer's claim that control of the work to be done was in the hands of Universal Am–Can are the subject of government regulations. The WCJ relied upon the fact that Universal Am–Can's regulations included requirements for mandatory inspections, for observing speed limits, and for covering the loads with tarps. Inspection requirements and speed limits are obviously subjects of government regulations. As to covering loads with tarps, John Mumpower, Universal Am–Can's Regional Manager, testified that the securing of loads with tarps was subject to government regulation. R. 107a. Minteer himself testified that loads had to be secured to meet the approval of the Pennsylvania Department of Transportation to transport them. R. 24a.

The WCJ emphasized provisions of the driver's manual that relieved Minteer of all duty and responsibility as to the vehicle and cargo when "off duty" while making the mandatory one hour stop for meals; however, Federal Motor Carrier Safety Regulations regulate hours of service of drivers and maximum driving time, 49 C.F.R. §§ 395.1, 395.3. The WCJ also emphasized his finding that while the Contractor Operating Agreement made Minteer fully responsible for hiring, firing and directing drivers of the tractor-trailer, Minteer was required to obtain Universal Am–Can's approval of all additional personnel; however, Federal Motor Carrier Safety Regulations regulate commercial driver's license standards, 49 C.F.R. § 383.37. The regulations would prohibit Minteer from hiring his own drivers where, *inter alia*, the driver had a commercial motor vehicle driver's license under suspension, revocation or cancellation. See also, Contractor Operating Agreement, paragraph 3, R. 262a. The requisite approval of Universal Am Can merely provided a method for ensuring compliance with federal regulations.

The obligations imposed by law upon a motor carrier such as Universal Am–Can when leasing equipment from an owner-operator are not probative of the question of whether the carrier exercises control over the manner of the work to be performed by the owner-operator. The regulations reflect the control of the government, not the motor carrier.

Minteer had the right to haul freight for others and the right to refuse assignments from Universal Am–Can. The WCJ placed great emphasis on the fact that Universal Am–Can retained the right to approve the hauling of freight for others. This reflects the nature of the industry, however, which permits "trip leasing" while the equipment of an owner-operator is leased to a motor carrier.

Trip leasing would allow Minteer to haul freight for a different authorized carrier while the equipment was under lease to Universal Am–Can. The federal regulations require, however, a separate written agreement with the second carri-

er. The trip lease agreement specifies the duration of the agreement and the movement of the freight.

The Federal Motor Carrier Safety Regulations allow written equipment leases to provide for "considering the authorized carrier lessee as the owner of the equipment for the purpose of subleasing it ... to other authorized carriers during the lease." 49 C.F.R. § 376.12(2). Under the lease agreement with Minteer, Universal Am–Can assumed complete responsibility for the operation of the equipment for the duration of the lease. In the absence of a trip lease with a different authorized motor carrier, Universal Am–Can would ultimately be responsible for the use of the equipment. Requiring Minteer to seek approval from Universal Am–Can before using the leased equipment to haul for another carrier under those circumstances is not inconsistent with either party's rights and responsibilities under the lease agreement.

The record in this case failed to establish that Universal Am–Can exercised control over the work to be done by Minteer or over the manner in which it was to be performed. Based upon the foregoing, we conclude that the Commonwealth Court erred in determining that Minteer was an employee of Universal Am–Can at the time of the injury. Accordingly, the order of the Commonwealth Court is reversed.

Justice CAPPY files a concurring and dissenting opinion in which Justice NIGRO and Justice NEWMAN join.

CAPPY, Justice, concurring and dissenting.

I join that part of the majority opinion which holds that relevant federal and state regulations governing written lease requirements for equipment leasing by an authorized carrier do not mandate a determination of employee status for an owner-operator of leased trucking equipment. Furthermore, I agree with the majority that this court's decision in *Hammermill Paper Company v. Rust Engineering Company*, 430 Pa. 365, 243 A.2d 389, 392 (1968) sets forth the relevant factors in undertaking an analysis of employee or independent contractor status. However, I respectfully dissent with respect to

the majority's conclusion that Clarence O. Minteer (Claimant) was an independent contractor of Appellant Universal Am–Can, Ltd. (Universal) for purposes of the Pennsylvania Workers' Compensation Act (Act). 77 P.S. § 1, et seq.

Federal law has extensively regulated the motor carrier field. 49 CFR Ch. III. Of course, compliance with federal regulation in this area is mandatory. Thus, I agree with the majority that conduct required by federal regulation should not be considered when determining employee/independent contractor status. However, since federal regulation has eliminated many of the traditional considerations used in determining employee/independent contractor status, then necessarily, heightened scrutiny must be given to those remaining aspects of the relationship that are extra-regulatory.

At the outset, it is important to note that there is no public policy in favor of employee or independent contractor status. Rather, inferences favoring a claim need only be slightly stronger than those against claim recognition. *Diehl v. Keystone Alloys Co.*, 398 Pa. 56, 156 A.2d 818, 820 (1959). Thus, only a slight tipping of the scales in favor of employee status is required to sustain granting benefits to a claimant.

While certain criteria pointed to by the majority suggests independent contractor status, other weightier factors tip the scales in favor of employee status. Numerous aspects of the relationship between Universal and Claimant confirm that Universal's significant right to control Claimant's work and the manner in which Claimant's work was to be performed goes beyond the requirements found in federal regulations and mandate a finding of an employer/employee relationship.

Claimant's "independence" from Universal's control, upon closer scrutiny, is severely limited and commands a finding of employee status. Specifically, Universal purports to allow Claimant to refuse a load, yet he may do so only if no other commodity is available ("The Contractor may decline to haul any particular commodity provided by the Carrier and Carrier shall not provide to Contractor any commodity load previously declined by the Contractor unless there is no other commodity

available."). Contractor Operating Agreement (Agreement) p. 2 para. 4. Likewise, according to Claimant, he could not return home empty without Universal's approval. R.R. 231a–32a.

Claimant may broker a load for another carrier only if there is no Universal freight available. Driver Manual (Manual) p. 7. Claimant may not trip lease if Universal freight is available. Manual p. 9. Thus, while purporting to be an independent contractor, Claimant is captured, absent limited circumstances. Moreover, in the instance in which trip leasing is permitted, Universal takes from Claimant, not a set expense fee, but a percentage of Claimant's gross transportation revenue. Agreement, p. 1, para. 1; Manual p. 49. Thus, rather than operating independently, even when Universal permits Claimant to perform work for another entity, Universal uses Claimant's "independent" work as a profit center for itself.

Another prime example of the control exercised by Universal over Claimant is in the purchase of insurance. The testimony of record establishes that when he began working for Universal, Claimant was required to cancel his insurance and to purchase all his insurance from Universal. If Claimant failed to purchase insurance through Universal, Claimant could not drive for Universal. RR. 16a–17a, 233a. These examples of Universal's significant control over Claimant belie a finding that Claimant is a true independent contractor.

The right to control the manner of performance is another significant factor in determining employee/independent contractor status. Outside of compliance with federal regulations, Universal governs the performance of Claimant's work in numerous ways. While federal regulations set forth criteria for qualified drivers, the Agreement with Claimant goes farther and allows Universal the unfettered right to disapprove of any of Claimant's drivers, whether or not they are otherwise qualified under federal regulation. Agreement, p. 4, para. 7F. While Universal and Claimant are subject to federal safety requirements, Universal goes beyond these requirements and subjects Claimant to random safety checks. Manual p. 48.

Not the subject of regulation, Universal requires all drivers to telephone Universal's dispatcher every 12–24 hours. Significantly, Claimant is subject to fine for failure to comply. Manual pp. 9–10. Furthermore, the Agreement purports to place upon Claimant all responsibility for, *inter alia,* paying operating and maintenance expenses including all expenses for fuel, road taxes, mileage taxes, fuel taxes, licenses, permits, and tolls. Agreement p. 4, para. 7. Yet, Universal mandates that Claimant purchase enough fuel to cover the mileage driven and to turn in fuel tickets verifying required purchases. Manual p. 18. Universal requires that it file fuel tax reports. Manual p. 18. It is Universal that applies for and files Ohio Highway use tax, and fuel receipts must be in Universal's name. Manual p. 18. Universal requires documentation from Claimant for fuel receipts, fuel and use tax worksheets and toll receipts. Manual p. 20. Although there was testimony that the carrier must ultimately be in compliance with regulations regarding reporting for fuel tax purposes, other evidence indicated that federal regulations only required designation as to the responsible party, and in this case, it was Claimant that was deemed to be responsible for all fuel taxes. 49 CFR § 376.12(e); R.R. 245a–247a, 252a–254a; Agreement p. 4, para. 7D.

Likewise, while all permits are supplied by Universal, Claimant is responsible for their expense. Manual p. 42; Agreement p. 4. para. 7D. However, during the first year, Universal charges claimant for permits, but during subsequent years, all permits are provided by Universal at no charge if certain minimum gross revenues are maintained. Manual p. 42. Related thereto, even though Claimant was responsible for keeping a daily log, Universal retained the right to "audit" the logs and to "reprimand" Claimant for violation for Hours of Service Regulations in conjunction therewith. Manual p. 27.

Finally, numerous rights possessed by Universal are cast in terms of an employer/employee relationship. Universal grants "advances" and "credit" to its drivers. Manual p. 1; Agreement p. 2, para. 5, p. 4, para. 9. Universal requires that

Claimant obtain prior approval for a "leave of absence." Manual p. 8. Similarly, it is especially telling of the relationship that Universal may "fine," "reprimand" and "terminate" Claimant for non-compliance in a number of areas. Specifically, Claimant is subject to progressive discipline and can be punished in the nature of a fine or "termination" for failing to call Universal's dispatcher for approval to work for another carrier. Manual p. 49. Likewise, Claimant can be fined for failing to call every 24 hours while under load. Manual p. 9. Claimant can be reprimanded for failure to properly maintain his daily log. Manual p. 27. The right to punish or to discipline is clear indicia of an employer/employee relationship.

Thus, while federal regulation impacts the relationship between Universal and Claimant, the terms of the Agreement and Manual evince Universal's great right to control Claimant's work and the manner in which Claimant performs his work. I conclude that Universal's pervasive and significant extra-regulatory right to control Claimant tips the scales in favor of a finding that Claimant was an employee of Universal for purposes of the Act. Thus, I would affirm the order of the Commonwealth Court, albeit for different reasons.[1]

Justice NIGRO and Justice NEWMAN join this Concurring and Dissenting Opinion.

---

1. We may affirm the decision of the immediate lower court on any basis, without regard to the basis on which the court below relied. *Bearoff v. Bearoff*, 458 Pa. 494, 327 A.2d 72 (1974); *Taylor v. Churchill Country Club*, 425 Pa. 266, 228 A.2d 768 (1967); *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955).