## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Berkebile Towing and Recovery, :
                 Petitioner :
       :
       v.               :
       :
Workers' Compensation Appeal Board :
(Harr, State Workers' Insurance Fund :
and Uninsured Employers Guaranty :
Fund),             :    No. 220 C.D. 2020
            Respondents    :    Submitted: December 4, 2020


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE P. KEVIN BROBSON, Judge[1]
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION
BY JUDGE FIZZANO CANNON          FILED: May 10, 2021


       Berkebile Towing and Recovery (Berkebile Towing)[2] appeals from the January 31, 2020, decision and order of the Workers' Compensation Appeal Board (Board) affirming the December 27, 2018, decision and order of a Workers' Compensation Judge (WCJ). The WCJ found James Harr (Harr) was an employee of Berkebile Towing rather than an independent contractor and therefore awarded

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] Berkebile Towing's owner identified the company in his testimony as "Berkebile Auto Service." Reproduced Record (R.R.) at 273a. For clarity, the name appearing in the caption of this case is used in this opinion.

fatal claim benefits to Antoinette Migut (Migut), Harr's fiancée, on behalf of Harr's two surviving minor dependent children.[3]  Upon review, we affirm.

## I.  Procedural History

In March 2017, Migut filed a fatal claim petition (Petition) with the Uninsured Employers Guaranty Fund (UEGF) concerning Harr's December 2016 work-related death.  Reproduced Record (R.R.) at 4a-5a.  The Petition stated that Harr was working for Berkebile Towing as a tow truck operator when he became pinned between two vehicles and suffered fatal injuries.  *Id*. at 4a.  The Petition sought fatal claim benefits on behalf of Migut's children based on asserted weekly wages of $425.00.  *Id*. at 5a.  Berkebile Towing and the UEGF each answered the Petition, denying both liability and that Berkebile Towing and Harr had an employer-employee relationship.  *Id*. at 7a-14a.

The WCJ issued a decision and order on December 27, 2018, finding the existence of an employer-employee relationship and granting fatal claim benefits.  WCJ Decision, 12/27/18; R.R. at 17a-29a.  Berkebile Towing appealed to the Board,[4] which affirmed.

---

[3] The younger child is the daughter of Harr and Migut; the older daughter is Migut's from a prior relationship, with whom Harr had a supportive parental relationship.  R.R. at 90a-92a & 95a-96a.

[4] UEGF did not participate in the appeal to the Board and advised this Court by letter that it would not be participating in Berkebile Towing's appeal to this Court as UEGF "did not disagree with the [WCJ's] or the [Board's] findings below."  UEGF Letter to Commonwealth Court, 10/22/20; *see also* Board Decision, 1/31/20, at 2, R.R. at 61a.

## II. Factual Background

At the hearing of this matter, Migut, Toni Harr, Harr's older daughter from a previous relationship, and Georgene Krawczyk (Krawczyk), Harr's friend and former roommate who also worked for Berkebile Towing, all testified in support of Migut's claim on Harr's behalf. Berkebile Towing owner Harold Berkebile (Berkebile), and several former and current Berkebile Towing employees, including Gary Vivian (Vivian), Michael Elbertson (Elbertson), and Harold Cole (Cole), testified on behalf of Berkebile Towing. These witnesses each offered testimony regarding the nature and use of Berkebile Towing's tow trucks and tools, as well as multiple other aspects and details of Berkebile Towing's operations.

*A. Berkebile Towing's Tow Trucks*

Migut[5] explained that Harr usually drove a tow truck that was prominently marked with Berkebile Towing's name and telephone number. R.R. at 111a & 114a. Migut and Toni Harr each testified that Harr did not own the trucks he drove for Berkebile Towing and did not pay formal lease or rental payments for the trucks. *Id.* at 115a-16a & 218a-19a. They also testified that Harr did not pay for the trucks' registration, inspections, or insurance. *Id.* 115a-16a & 218a-219a. Migut and Toni Harr each also added that Berkebile Towing provided Harr with a card to pay for the trucks' fuel. R.R. at 117a, 233a & 252a.

In his testimony, Berkebile confirmed that he pays for the gas, insurance, registrations, and inspections for Berkebile Towing's tow trucks. R.R. at

---

[5] Migut explained that she had been in a relationship with Harr for 9-10 years and lived with him for 6 years before his death. R.R. at 89a. Migut was familiar with Harr's work for Berkebile Towing as a tow truck driver, in which he had been engaged throughout the entirety of their relationship. *Id.* at 110a-11a & 114a.

3

287a & 309a-10a. Berkebile further testified that, since he took over the business in 1968, he has verbal agreements with the drivers to lease the trucks for a 10 percent lease fee. *Id*. at 304a, 307a, 370a-71a & 374a-75a. Berkebile asserted that the drivers are told that "they're responsible for anything that happens to themselves." *Id*. at 370a-71a. While Berkebile acknowledged that he has the authority to direct which calls to take and which trucks will be used for specific tow jobs, stating "I guess I could do anything I wanted to since it's my stuff," he maintained that he generally does not exercise such authority. *Id*. at 347a-48a.

Berkebile claimed that Berkebile Towing's tow trucks are affixed with 1x2-inch stickers that state that the vehicles are leased to the drivers. *Id*. at 305a-08a, 311a, & 369a. Berkebile explained that he made and placed these stickers on Berkebile Towing's tow truck doors near the driving cab area 4-6 years ago after seeing similar stickers on other companies' vehicles. *Id*. at 370a-74a.

Krawczyk, who worked part-time for Berkebile Towing in 2008, testified that during her employment, Berkebile Towing's trucks did not have stickers indicating the trucks were leased to the drivers. R.R. at 489a, 492a-99a, 515a & 532a-33a. Krawczyk testified that she sees Berkebile Towing's trucks around town and is certain that she only noticed the stickers on the tow trucks since 2017, after Harr's death. *Id*. at 502a & 524a.

The record includes photographs of Berkebile Towing's truck doors with the "vehicle leased to driver" stickers placed above the vehicle registration numbers, Berkebile Towing's phone number, name (in all capital letters), and the phrase "24-hr towing." R.R. at 649a-54a. Additionally, the record includes pictures of ads in local publications portraying Berkebile Towing's trucks with the company's name and contact information visible on the doors. *Id*. at 543a-45a. The WCJ found the "leased to driver" stickers to be "utterly inconspicuous" and

4

"dwarfed by the signage on the truck[s] indicating that they were Berkebile Towing vehicles." WCJ Decision; R.R. at 25a.

Berkebile Towing employees Vivian and Elbertson generally supported Berkebile's testimony regarding the drivers and the tow trucks. R.R. at 381a-83a & 411a-14a. Additionally, Cole initially stated that Berkebile owned the trucks and assigned drivers to trucks generally, but subsequently averred that Berkebile had never told him which truck to drive. *Id.* at 459a & 462a.

Migut, Berkebile, and Cole all testified that Berkebile Towing's drivers, Harr included, could not use Berkebile Towing's trucks to do jobs for other companies. *See* R.R. at 119a, 299a, 308a, 323a-24a & 461a-63a. If a driver got a call that he could not accept, he could not lend the truck to another tow truck driver to do the job in his stead; he could only ask Berkebile Towing to send another of its drivers. *Id.* at 119a & 324a-25a. The trucks were kept at Berkebile Towing's primary location (the shop) except when drivers occasionally took them home.[6] *Id.* at 122a-23a.

Migut and Toni Harr each stated that Harr drove his personal car to the Berkebile Towing shop, but he did not generally use his personal car for work assignments while he was at the shop. R.R. at 163a, 182a & 233a-34a. Harr would use his personal car on occasion, about 5-6 times a year, when he got a call from Berkebile Towing for a non-towing roadside service job like fixing a flat tire, charging or changing a battery, or bringing gas to a driver who had run out. *Id.* at 163a & 182a. More often, however, Harr completed such calls in a Berkebile Towing truck. *Id.*

---

[6] Cole explained that this arrangement simplified off-hours tow jobs because drivers on call did not have to go to the shop and get the truck before going to the job. R.R. at 463a.

*B. Tools*

Migut testified that, although Harr did not own or buy the tools or equipment for the tow jobs he did for Berkebile Towing, he did have some tools of his own that he kept at Berkebile Towing's shop. R.R. at 120a & 166a. Berkebile testified, however, that Berkebile Towing's tow trucks are fully equipped, so drivers do not need to bring their own tools or equipment. *Id*. at 321a.

*C. Work Schedule and Duties*

Migut and Toni Harr both stated that Harr had no other employers and did no side work. R.R. at 158a-59a, 186a & 219a. Each also explained that Harr did not have a set schedule, but was instead on call on a "24/7" basis for towing or roadside service assignments, which he received on his personal cell phone from Berkebile Towing's dispatchers. *Id*. at 118a, 124a, 180a-81a & 254a. Harr's personal phone was a prepaid cell phone that he had to keep in active status to receive work calls. *Id*. at 251a. Toni Harr and Krawczyk further testified, and Berkebile and Elbertson each acknowledged, that if a dispatcher was not on duty, calls to the Berkebile Towing shop would be forwarded directly to drivers' phones. *Id*. at 252a, 286a & 422a. Drivers could turn calls down, but Harr rarely did unless he was sick. *Id*. at 186a-87a, 278a & 291a. Berkebile conceded that Berkebile Towing would lose money if drivers did not take and do job calls, so frequent driver call refusals created an incentive to stop giving them assignments, informally terminating them. *Id*. at 319a-20a & 348a.

Migut and Toni Harr also testified that Harr went to the Berkebile Towing shop every day it was open and occasionally did odd jobs like cleaning a furnace or cutting trees at the shop. R.R. at 121a-22a, 124a & 222a. Berkebile Towing also tasked Harr with sweeping up around the shop and cleaning the trucks.

6

*Id*. at 243a.   Some days Harr went to the shop early in the morning and would not come home until late at night.  *Id*. at 168a-69a.  On other days, Harr went in to the shop but came home quickly due to a lack of tow calls.  *Id.*

*D. Training and Supervision*

Toni Harr testified that Harr had been a tow truck driver for about four years before he started with Berkebile Towing.  R.R. at 208a & 213a.  Harr had a certification for tow truck driving and some instructional videos, but Toni Harr did not know how they were acquired.  *Id*. at 213a & 239a-40a.  Harr had a commercial driver's license (CDL) permit that Berkebile Towing paid for initially, but he never got his full CDL.  *Id*. at 240a.

Migut testified that Harr had taken instructional towing classes before she met him, but that she did not know who paid for the classes.  R.R. at 173a-75a.  Berkebile testified that drivers who wanted additional instruction or training had to pay for such instruction or training themselves.  *Id*. at 293a.

Migut, Berkebile, Elbertson, and Cole all testified that no one supervised Harr when he did tow jobs or other service calls for Berkebile Towing.  R.R. at 171a-72a, 291a-92a, 416a & 459a.  Migut or Toni Harr sometimes accompanied Harr on non-towing calls for Berkebile Towing.  *Id.* at 165a, 215a, 220a & 231a-32a.  Toni Harr testified that in 2011, Berkebile Towing informed Harr that his children were no longer permitted to accompany him on job calls.  *Id*. at 232a.  Berkebile testified, however, that he was aware that Migut and Toni Harr sometimes rode with Harr when he did his runs, but he did not tell Harr that his children could not accompany him because Harr leased the tow truck from Berkebile Towing.  *Id*. at 285a-86a.

7

*E. Uniforms*

Migut testified that Harr had some clothing with Berkebile Towing's name on it that he always wore when he worked, but that she did not know if Harr purchased the items. R.R. at 176a & 178a. Krawczyk testified that Berkebile Towing gave her a shirt with Berkebile Towing's name on it and she purchased her own fluorescent yellow safety vest. *Id*. at 516a-17a. Berkebile stated that Berkebile Towing-branded uniforms are available if drivers want to pay for them themselves, but that drivers are not required to wear them. *Id*. at 288a, 327a, & 349a.

*F. Pay Structure*

Migut explained that Berkebile Towing paid Harr in cash every Friday, which the other witnesses confirmed was the general practice. R.R. at 159a, 277a, 382a, 433a & 440a-41a. Drivers receive a list of their weekly calls showing the accounting of their pay. *Id*. at 280a. Drivers receive 40 percent of Berkebile Towing's receipts for jobs they performed using Berkebile Towing's trucks. *Id.* at 277a. 60 percent of the receipts goes to Berkebile Towing, 10 percent of which is allocated for the use, fuel, and upkeep of the trucks. *Id*. at 298a. Drivers receive 50 percent of Berkebile Towing's receipts for non-tow assignments in which they use their own vehicles. R.R. at 277a. Migut recalled that Harr did not get paid if he did not go on calls. *Id*. at 169a.

Migut stated that customers paid Harr and he would turn over the cash or check to Berkebile Towing. R.R. at 165a. Toni Harr testified that if Harr received payment by check, it was made out to Berkebile Towing. *Id*. at 219a-20a. She further testified that if she utilized Berkebile Towing's towing services, she had to pay like any other customer. *Id.* at 220a.

8

Berkebile testified that Berkebile Towing has arrangements for towing with the United States Postal Service, Allstate Insurance, and other entities. R.R. at 322a. Berkebile negotiated these arrangements and the per-tow rates, and his drivers could only charge those rates on those jobs. *Id*. On non-contract call-in jobs, the driver estimates a charge based on the conditions and requirements at the site. *Id*. at 323a. Berkebile also averred that Berkebile Towing's company tax returns show contractor labor payments, not wages paid. *Id*. at 290a.

*G. Contract with Berkebile Towing*

Berkebile testified that all Berkebile Towing workers, including Harr, signed independent contractor agreements when they began working for the company. R.R. at 275a. Berkebile Towing's independent contractor agreement form (IC Agreement), which Harr signed in 2004, states:

> This agreement is between [Harr], Contractor and Berkebile Auto Company.[7]
>
> Whereas the aforementioned [C]ontractor understands and agrees there is no employer-employee relationship existing between the Company and the Contractor, and as such all liability as to local, county, state and federal taxes due them from the Contractor is solely the full responsibility of the Contractor.
>
> In addition, the [C]ompany assumes no liability in any form from the Contractor as a consequence of this agreement.

---

[7] The record does not indicate what relationship exists between Berkebile Auto Company and Berkebile Towing.

9

All services performed by Contractor shall be agreed upon
verbally by both parties prior to any services being
performed.

*Id.* at 554a & 579a-81a. Thus, the IC Agreement expressly states that no employer-
employee relationship exists, that no taxes will be withheld, and that no liability is
assumed. *Id.* at 275a-77a & 281a. The IC Agreement does not state the nature of
the work being done, the pay arrangements, or when the employment arrangements
or agreements will terminate. *Id.* at 340a-42a.

*H. Workers' Compensation Insurance*

Berkebile Towing does not maintain workers' compensation insurance.
R.R. at 299a. Berkebile testified that, under the IC Agreement, Berkebile Towing is
"not responsible for nobody's [*sic*] safety." *Id.* at 325a. Berkebile does not follow
up to ensure that his drivers are maintaining their own health insurance. *Id.* at 325a.
Berkebile admitted that Harr's death was investigated by the federal Occupational
Safety and Health Administration (OSHA) and that Berkebile Towing was assessed
a fine of $12,675 for workplace safety violations.[8] *Id.* at 345a.

**III. Issue Presented**

Berkebile Towing now appeals to this Court and argues that the WCJ
and Board erred in finding an employer-employee relationship existed between
Berkebile Towing and Harr.[9] Berkebile Towing's Br. at 4. Berkebile Towing points

---

[8] Berkebile has appealed the fine. R.R. at 346a.

[9] Berkebile Towing phrased its question presented as follows: "Did the [Board] err in
determining that [Harr] was an employee of [Berkebile] and not an independent contractor at the
time of [Harr's] death?" Berkebile Towing's Br. at 4.

10

to the written IC Agreement, the pay and tax arrangements, lack of a regular schedule or actual supervision of towing and service jobs, and Harr's purported freedom to pursue work or income from other sources. *Id*. at 13. In response, Migut asserts that the WCJ correctly followed policy directives favoring finding an employment relationship in close cases and properly analogized the facts here to on-point case law finding an employment relationship in very similar circumstances. Migut's Br. at 6 & 10-12.

## IV. Analysis

Under Sections 103 and 104 of the Workers' Compensation Act (Act),[10] an independent contractor is not entitled to benefits due to the absence of a master/servant relationship. *See* 77 P.S. §§ 21-22. Thus, status as an employee or independent contractor is a crucial threshold determination that must be made prior to awarding workers' compensation benefits. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000).

To receive benefits, claimants maintain the burden to establish an employer-employee relationship. *Universal Am-Can*, 762 A.2d at 330. Nevertheless, our Supreme Court has indicated that "neither the compensation authorities nor the courts should be solicitous to find contractorship rather than employment, and that inferences favoring the claim need make only slightly stronger appeal to reason than those opposed." *Id*. A determination regarding the existence of an employer-employee relationship is a question of law that is determined on the unique facts of each case. *Id*. at 330-31. As an appellate court, however, we are bound by the WCJ's authority over questions of credibility, conflicting evidence,

---

[10] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

evidentiary weight determinations, and findings of fact.[11]  *Edwards v. Workers'*
*Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1161 (Pa. Cmwlth.
2016).

"While no hard and fast rule exists to determine whether a particular
relationship is that of employer-employee or owner-independent contractor, certain
guidelines have been established and certain factors are required to be taken into
consideration."  *Universal Am-Can*, 762 A.2d at 333.  The following indicia and
principles are part of the inquiry:

> Control of manner [in which] work is to be done;
> responsibility for result only; terms of agreement between
> the parties; the nature of the work or occupation; skill
> required for performance; whether one is engaged in a
> distinct occupation or business; which party supplied the
> tools; whether payment is by the time or by the job;
> whether work is part of the regular business of the
> employer, and also the right to terminate the employment
> at any time.
>
> Whether some or all of these factors exist in any given
> situation is not controlling.  Further, while each factor is
> relevant, there are certain guidelines that have been
> elevated to be dominant considerations. . . . [C]ontrol over
> the work to be completed and the manner in which it is to
> be performed are the primary factors in determining
> employee status.  Moreover, it is the existence of the right

---

[11] Appellate review in workers' compensation proceedings is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 331 n.2 (Pa. 2000).  Review of the findings of fact is limited to the question of whether the administrative findings are adequately supported by the evidence as a whole; credibility is solely an issue for the finder of fact; and findings of fact will be overturned only if they are arbitrary and capricious. *Bethenergy Mines, Inc. v. Workmen's Comp. Appeal Bd. (Skirpan)*, 612 A.2d 434, 437 (Pa. 1992).

> to control that is significant, irrespective of whether the control is actually exercised.

*Id.* (citations and quotation marks omitted); *see also Edwards*, 134 A.3d at 1162.

Additional factors, although not determinative in themselves, may include the putative employer's payment of wages and withholding for income taxes, provision of workers' compensation coverage, and the existence of an employment or independent contractor agreement. *Edwards*, 134 A.3d at 1163. Specific to the trucking industry, the presence of a business's name and information on the outside of a truck is relevant although not dispositive of an employment relationship. *Universal Am-Can*, 762 A.2d at 332.

This Court addressed the specific employment status of a tow truck driver in *Sarver Towing v. Workers' Compensation Appeal Board (Bowser)*, 736 A.2d 61 (Pa. Cmwlth. 1999). There, the claimant signed an agreement with the employer to work on commission and be responsible for his own taxes. *Sarver*, 736 A.2d at 62. The claimant was provided with a tow truck owned by the employer and having the employer's name on it and all tools and equipment for towing included – described by this Court as "obviously, very substantial assets." *Id.* at 63. The claimant was permitted to keep the truck at home but was not permitted to use it to perform work for anyone other than the employer. *Id.* at 62. He was on call "24/7" and received his assignments by pager or telephone. *Id.* He was not directly supervised while on tow jobs. *Id.* He was injured when, at the employer's direction, he lifted a large computer on the premises and hurt his back. *Id.* The WCJ concluded that he was an independent contractor, but the Board reversed and this Court affirmed in the claimant's favor. *Id.*

In *Sarver*, this Court acknowledged the longstanding tenet that "control of the work and the manner in which the work is accomplished" is the "key

13

indicator" in the analysis of an employment relationship. *Sarver*, 736 A.2d at 63. Although the WCJ in *Sarver* focused on the fact that the employer did not supervise the claimant on his individual tow jobs, this Court emphasized that the employer "*did* exercise substantial control over [the c]laimant and the manner in which he performed his work," such as limiting his use of its trucks to work only its tow jobs, requiring him to be on call 24/7, and retaining the ability to take back the truck and equipment at any time if it was not satisfied with his work. *Id*. (emphasis in original). Moreover, the Court noted that "it is the existence of the *right* to control the manner of [a c]laimant's work which is critical, even when that right is not exercised." *Id*. (emphasis in original). Although the claimant's injury occurred when he was not driving a tow truck, but rather lifting a large computer at the employer's request, this Court found that the request itself was "clearly indicative of the fact that [the employer] had the control over [the c]laimant to tell him what to do and the manner of how he was to do it." *Id*.

In *Baykhanov v. Workers' Compensation Appeal Board (Onixe Express)* (Pa. Cmwlth., No. 245 C.D. 2018, filed October 12, 2018),[12] this Court declined to find an employment relationship although the facts were similar to those in *Sarver*. The claimant, a car carrier driver, had signed an IC agreement, the employer owned and assigned the claimant his truck, the claimant received his assignments from a dispatcher, he was not supervised while on assignments, he was paid by the trip and received a 1099 tax form, and he was free to reject assignments although he stated he rarely did so. *Baykhanov*, slip op. at 1-4. The WCJ did not find an employment relationship and in a divided memorandum opinion, this Court

---

[12] Unreported memorandum opinions of this Court may be cited for their persuasive value pursuant to Rule 126(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b)(1), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

14

affirmed, prioritizing the WCJ having found the claimant's testimony less credible than that of the employer's witnesses as to the nature of the relationship between the claimant and employer. *Id.*, slip op. at 10 & n.4. This Court also noted that in this case, the driver was injured in the course of his work as a driver, whereas in *Sarver*, the claimant was injured doing a non-driving task at the employer's request. *Id.*, slip op. at 13.

The dissent in *Baykhanov* would have found an employment relationship. *Baykhanov v. Workers' Comp. Appeal Bd. (Onixe Express)* (Pa. Cmwlth. No. 245 C.D. 2018, filed Oct. 12, 2008) (Covey, J., dissenting), slip op. at 3. The dissent first noted the policy in favor of finding an employment relationship. *Id.*, (Covey, J., dissent) slip op. at 3 (citing *Universal Am-Can*). The dissent also emphasized that the employer owned, insured, and paid for gas for the truck and that the claimant only operated the vehicle "through the defendant's authority," which the employer clearly had the right to exercise even if it had not previously done so. *Id.*, (Covey, J., dissent) slip op. at 4-6 (quoting *Sarver* and *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 611-12 (Pa. Cmwlth. 2012)). Finally, the dissent did not find it dispositive that the claimant was injured while driving as opposed to *Sarver*, where the injury occurred while the claimant was lifting a computer at the employer's request. *Id.*, (Covey, J., dissent) slip op. at 6 n.2. To the dissent, the majority's distinction "appears to be stating that an individual may be an employee for part of the time and an independent contractor for the other part of the time. That is not the state of the law and such would be unmanageable and lead to absurd results." *Id.*, (Covey, J., dissent) slip op. at 6 n.2.

In *Baum v. Workers' Compensation Appeal Board (Hitchcock)*, 721 A.2d 402 (Pa. Cmwlth. 1998), the claimant, a truck driver, was not authorized to keep the employer's trucks during off-hours, but *Baum* is otherwise analogous to

15

*Sarver* and to the instant case. In that case, the employer owned the trucks and received payment from the customers and then paid the claimant in cash for each truckload or job. *Baum*, 721 A.2d at 403-05. Like Harr, the claimant in *Baum* had the ability to decline work. *Id*. at 404. The WCJ and Board in *Baum* both found an employment relationship, and this Court agreed, specifically concluding that the ability to decline work did not defeat the otherwise persuasive evidence of an employer-employee relationship. *See id.* at 406 ("[J]ust because [the c]laimant had the ability to decline work whenever he chose to do so [did] not mean that an employer-employee relationship did not exist, only that the relationship was one which gave [the c]laimant flexibility in determining his work schedule[.]").

While an employer-employee relationship inquiry is a question of law on appeal, it depends heavily on the WCJ's underlying credibility and factual determinations. *Universal Am-Can*, 762 A.2d at 330-31; *Sarver*, 736 A.2d at 62-63. All of the *Universal Am-Can* and *Edwards* factors are part of the relevant inquiry, but the primary consideration is the right of the employer to control the work and the manner in which it is accomplished, even if that right is not exercised. *Universal Am-Can*, 762 A.2d at 333; *Sarver*, 736 A.2d at 63. Given the remedial and salutary goals of workers' compensation, the factual bases favoring a finding of an employer-employee relationship need only be slightly stronger than those favoring contractorship. *Universal Am-Can*, 762 A.2d at 331; *Diehl v. Keystone Alloys Co.*, 156 A.2d 818, 820 (Pa. 1959).

Here, Berkebile Towing's witnesses – Berkebile, Vivian, Elbertson, and Cole – all testified to their understanding that Berkebile Towing's tow truck drivers were contractors, that they leased their trucks from Berkebile Towing, that they were paid by the tow or auto mechanic work job, and that Berkebile Towing

16

was not liable for their taxes or personal injury or liability. R.R. at 275a-77a, 285a-86a, 370a-71a, 381a-83a, 394a-95a, 412a, 431a, 438a & 448a.

However, Migut testified to her understanding that Harr could not use Berkebile Towing's trucks to do jobs for other companies. R.R. at 119a. She further explained that if Harr got a call from another company, he could not accept it, and he could not lend the truck to another tow truck driver to do the job in his stead. *Id.* When he was notified of a job for Berkebile Towing, Harr would call Berkebile Towing and either accept the job or ask Berkebile Towing to send another driver. *Id.*

Toni Harr recalled that when she accompanied Harr on tow jobs, payments by check were made to Berkebile Towing, not Harr. R.R. at 219a-20a. She also testified that Harr used Berkebile Towing's trucks and equipment for tow jobs and only rarely would use his own vehicle for roadside assistance calls. *Id.* at 216a-17a, 232a-34a & 252a. She further testified that, while Harr had brought her on his jobs so that they could spend time together when she was younger, Berkebile Towing told Harr in 2011 that he must discontinue the practice. *Id.* at 232a.

Krawczyk, who worked for Berkebile Towing with Harr, testified that she understood herself to be a Berkebile Towing employee. R.R. at 530a. She did not have a lease arrangement for any of Berkebile Towing's trucks when she used them for calls. *Id.* at 490a-92a. Further, she did not believe she could refuse a call unless she had an emergency or some other reason. *Id.* at 509a-12a & 530a.

The WCJ found all Berkebile Towing's and Harr's witnesses to be credible. WCJ Decision; R.R. at 24a. The WCJ found that the verbal payment arrangements on a "by the job" basis weighed against an employment relationship. *Id.* at 27a. The WCJ also recognized that Harr signed the IC Agreement that expressly stated that no employment relationship existed, that Berkebile Towing

17

"assume[d] no liability in any form" for Harr, and that Harr was responsible for all taxes on his income. *Id.* at 24a; IC Agreement, R.R. at 554a. However, the WCJ gave the written IC Agreement little weight, finding that, "rather than attempting to define an independent contractor relationship[,]" the IC Agreement was little more than a pretext for Berkebile Towing to avoid the obligations of having employees. WCJ Decision, R.R. at 24a.

The WCJ weighed the recognized factors, as set forth in *Universal Am-Can* and *Edwards*, and expressly considered the extent of Berkebile Towing's right of control over the work to be completed by Harr and other drivers, the factor acknowledged as "first among equals" among the employer-employee relationship inquiry factors. WCJ Decision, R.R. at 26a-28a; *see Universal Am-Can*, 762 A.2d at 333; *Edwards*, 134 A.3d at 1162. The WCJ also analyzed the recognized factors concerning the nature of the work, the skills required to do the work, the centrality of the work to Berkebile Towing's business, Berkebile's supply of the tools and equipment for the work, and the right to terminate the relationship. WCJ Decision, R.R. at 26a-28a. Specific to the trucking and towing field, the WCJ examined Berkebile Towing's ownership of the trucks, Berkebile Towing's setting of rates and collection of payment for jobs, the lack of a written lease arrangement with Harr and other drivers, and Berkebile Towing's prohibition against drivers using Berkebile Towing's trucks to take calls from other towing companies. *Id.* at 25a.

The WCJ found the facts largely analogous to those that established an employment relationship in *Sarver*. WCJ Decision, R.R. at 26a-28a. The WCJ concluded that, although Berkebile Towing did not "micro-manage" any individual tow job, Berkebile Towing did maintain "extensive dominion over [Harr's] workday." *Id.* at 27a (citing *Sarver*). The WCJ emphasized that all of Harr's work

18

came from Berkebile Towing, and he was on call for Berkebile Towing on a "24/7" basis. *Id.*

The WCJ also opined specifically on the highly visible size of Berkebile Towing's name and information on the trucks, compared with the much smaller stickers indicating the trucks were leased to the drivers. WCJ Decision, R.R. at 25a. The WCJ determined that beyond those "utterly inconspicuous" stickers that were "dwarfed by the signage on the truck indicating that they were [Berkebile Towing's] vehicles," there was no convincing evidence of a lease arrangement for the trucks. *Id*.

In addition, the WCJ concluded that Berkebile Towing maintained a significant degree of control over how drivers could and could not use the trucks. R.R. at 25a & 27a. The WCJ observed that, although drivers could take trucks home during off-hours, Berkebile Towing allowed them to do so to facilitate their ability to take calls efficiently at those times, not to use the trucks as they chose on their own time or to lend the trucks out or do jobs for other towing companies. *Id.* Drivers could not loan the trucks out or use them for jobs not dedicated to Berkebile Towing's business. *Id.* Drivers did not set prices with customers, and if paid directly by customers, they turned over payment to Berkebile Towing. *Id.* Although drivers were tacitly permitted to have family and friends accompany them on calls until 2011, Berkebile Towing then rescinded that privilege. *Id.* at 25a. Further, at any time, particularly if a driver declined more calls than Berkebile Towing preferred, Berkebile Towing could stop assigning calls to that driver and, of course, reclaim its truck if the driver was in possession of it. *Id*. at 25a & 27a.

The WCJ found these facts overrode the existence of other facts mitigating in favor of contractorship, such as the written IC Agreement, the drivers' ability to decline jobs, payment by the job rather than by time, and the drivers'

19

responsibility for income taxes. WCJ Decision, R.R. at 27a. Even Berkebile Towing's own witnesses, including Cole and Berkebile himself, conceded that Berkebile Towing's ownership of the trucks afforded Berkebile Towing significant leverage over the drivers' ability to do their work, which for the most part required drivers to use Berkebile Towing's tow trucks. R.R. at 299a, 308a, 319a-20a, 322a-25a, 347a-48a, 443a & 459a-63a. In particular, Berkebile stated: "I guess I could do anything I wanted to since it's my stuff." R.R. at 299a, 308a, 323a-25a & 347a-48a. Berkebile also acknowledged that Berkebile Towing restricted drivers' use of the trucks while in their possession. *Id.*

The WCJ reasoned that these facts demonstrated significant control over the work done by Harr and other drivers and "squarely put [Harr's] case under the *Sarver* holding and compel a conclusion that [Harr] was an employee of [Berkebile Towing]." WCJ Decision, R.R. at 27a. In support of finding an employment relationship, the WCJ also cited *Baum*, where a truck driver was found to be an employee even though he had some ability to decline work, which this Court found to be evidence of flexibility in determining the work schedule rather than a negation of an employment relationship. *Id*. The WCJ ultimately found the facts in this case to be dispositive of an employer-employee relationship, and the Board affirmed. WCJ Decision, R.R. at 27a-28a; *see also* Board Decision, R.R. at 74a.

We reiterate that although this case presents a question of law on which this Court is not bound by the WCJ's legal conclusions, the inquiry is fact-specific and we are bound by the WCJ's factual and credibility determinations. *Edwards*, 134 A.3d at 1161. We agree with the WCJ and the Board that under the facts as found by the WCJ, Berkebile Towing's ownership and control over the availability and use of its trucks favor finding an employer-employee relationship with Harr. As in *Sarver*, the level of control that Berkebile Towing could exercise by allowing or

20

restricting the drivers' use of the trucks was substantial and significant. *See Sarver*, 736 A.2d at 63. As in *Baum*, Harr's ability to decline assignments does not negate the countervailing evidence of an employment relationship. *See Baum*, 721 A.2d at 406.

We acknowledge that in *Baykhanov*, similar facts led to a finding of independent contractorship, but as the WCJ here observed, *Sarver* is a unanimous published and precedential opinion and *Baykhanov* is a divided and unreported memorandum opinion. *See* WCJ Decision; R.R. at 28a. Moreover, the WCJ here found Harr's witnesses' testimony on behalf of an employment relationship to be credible, which was not the case in *Baykhanov*. R.R. at 24a; *Baykhanov* slip op. at 10 & n.4. *Baykhanov* is therefore distinguishable. Here, given the facts, law, standard of review, and policy at issue, we conclude Berkebile Towing has not established on appeal that the WCJ erred in finding an employment relationship, nor did the Board err in affirming the WCJ's decision.

## V. Conclusion

Accordingly, in light of the foregoing, we affirm the Board's conclusion that Harr was an employee of Berkebile Towing. Fatal claim benefits to Migut on behalf of the minor dependent children were warranted, along with reimbursement of funeral expenses.

_____
CHRISTINE FIZZANO CANNON, Judge

21

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Berkebile Towing and Recovery, : 
                Petitioner : 
                 : 
            v. : 
                 : 
Workers' Compensation Appeal Board : 
(Harr, State Workers' Insurance Fund : 
and Uninsured Employers Guaranty : 
Fund), :     No. 220 C.D. 2020
              Respondents : 

## O R D E R

AND NOW, this 10th day of May, 2021, the Order of the Workers' Compensation Appeal Board in the above-captioned matter is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge