IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IDI Logistics, Inc.,              :
              Petitioner       :
                    :
         v.                :
                    :
Larry Clayton and Uninsured    :
Employers Guarantee Fund (Workers'  :
Compensation Appeal Board),    :   No. 514 C.D. 2021
             Respondents    :   Submitted: May 27, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY
JUDGE FIZZANO CANNON          FILED: October 18, 2022

IDI Logistics, Inc. (Employer) petitions for review of the April 21, 2021, decision and order of the Workers' Compensation Appeal Board (Board). The Board reaffirmed its prior October 24, 2019, decision and order concluding that Larry Clayton (Claimant) was Employer's employee and not an independent contractor, and also concluded that Employer had not established that it offered Claimant valid light-duty work or that Claimant refused reasonable medical treatment. Upon review, we affirm.

## I. Factual & Procedural Background

On June 15, 2017, Claimant filed a claim petition against Employer seeking medical and wage loss benefits for a work-related left wrist injury he

sustained on May 4, 2017. Reproduced Record (R.R.) at 1a-2a. In July 2017, Claimant filed additional claim petitions against Employer and the Uninsured Employers Guaranty Fund (UEGF). *Id*. at 5a-9a. Employer and UEGF filed answers contesting the petitions, and this litigation ensued. *Id*. at 11a-19a.

Claimant testified at an August 22, 2017, hearing. Employer hired him as an 18-wheel flatbed truck driver in 2016 in Lebanon, Pennsylvania. R.R. at 105a-06a. He signed documents when he was hired, including an independent contractor agreement, and although he did not read them, he believed Employer had workers' compensation insurance. *Id*. at 116a-19a. He would drive his own vehicle to Employer's location in Lebanon, get one of Employer's trucks, and begin driving loads. *Id*. at 106a-07a. He was responsible for strapping down the loads on the truck, which could be lawnmowers, cinderblocks, construction equipment, or similar items. *Id*. at 107a.

Claimant got his driving assignments from "Joe," Employer's dispatcher, and after he dropped off a load, he would call Joe, tell him he was "empty," and Joe would find him another load. *Id*. at 108a. Claimant could refuse a driving assignment; he could also work for other companies, but never did. *Id*. at 121a-22a. He would not have been permitted to use Employer's trucks for other companies. *Id*. at 126a. He would stay out on the road for 3-4 weeks, then return to Lebanon, drop off the truck, and go home in his own vehicle. *Id*. He was paid by the mile and earned about $900-$1,300 per week. *Id*. at 108a-09a. He received a 1099 IRS form at year's end. *Id*. at 123a. He paid for his own food while on the road and determined his routes himself but was given a deadline for deliveries. *Id*. at 120a-22a & 126a.

2

On May 4, 2017, Claimant was strapping down and tarping a load of pipe on a run for Employer in Illinois when he fell off the trailer onto his left arm and hand. R.R. at 109a-10a & 120a. He called and reported the incident to Roxanne in Employer's Lebanon office and learned that Employer did not have workers' compensation insurance. *Id*. at 110a-11a & 125a. He was taken by ambulance to a hospital in Illinois, where his arm was x-rayed and splinted; he also was given a shot. *Id*. at 111a. He then got a cast put on his arm by a bone specialist in New York; Employer reimbursed him $500 for that cost. *Id*. at 112a & 115a. He later followed up with Dr. Norman Stempler, D.O., in Bethlehem, Pennsylvania. *Id*. As of the August 2017 hearing, Claimant expected to get his cast off several days later. *Id*. at 114a.

Claimant had no other injuries and was hoping to work so he could pay his bills; he thought he could operate a vehicle depending on how his wrist felt steering and securing loads on the truck. R.R. at 114a. Claimant initially stated that Employer had not contacted him about light-duty work; he later acknowledged that Employer spoke to him one time about riding along with other drivers as a passenger, but stated that Employer did not bring it up again. *Id*. at 114a & 124a.

At a January 23, 2018, hearing, William Bixler, Employer's owner, testified. He identified the agreement Claimant signed when he was hired and stated that all drivers must sign it; Claimant had not asked any questions about it. R.R. at 139a-40a & 149a. Bixler told Claimant that he would be an independent contractor rather than an employee and that there would be no workers' compensation coverage. *Id*. at 139a-40a & 146a. He confirmed that drivers may decline to accept a load when the dispatcher offers it to them. *Id*. at 141a. Claimant was never told that he had to take a specific load or what routes to take, but Employer did assign

3

deadlines for deliveries. *Id*. at 142a-43a. Drivers must follow any pertinent federal regulations, but Employer does not tell them how to perform their duties and does not pay for drivers' meals or lodging on the road. *Id*. at 143a. Drivers were not restricted from working for other companies but could not use Employer's trucks to do so. *Id*. at 144a & 147a. Employer owned and insured the trucks, paid for fuel, paid drivers by the mile, and issued 1099 IRS forms to drivers. *Id*. at 144a & 147a. After the injury, Bixler offered to allow Claimant to ride with other drivers and be paid some money, but Claimant did not respond. *Id*. at 145a & 149a. Bixler acknowledged that the offer had been informal. *Id*. at 150a.

Dr. Stempler, an orthopedist, testified for Claimant. He saw Claimant once on July 25, 2017, almost three months after the injury. R.R. at 73a. Claimant had sustained a severe, significant, and displaced left wrist fracture involving the joint. *Id*. at 74a. Claimant was still in a cast, so Dr. Stempler could not complete a full examination. *Id*. Dr. Stempler stated that for this type of injury, 6-8 weeks in a cast is normal. *Id*. at 73a & 85a. He learned that Claimant ultimately did not remove the cast until several months later, which was "almost three times as long as it should have been." *Id*. at 77a. He acknowledged that if the cast had been removed sooner, Claimant would have sustained less muscle atrophy. *Id*. at 83a. He could not remove the cast when Claimant was in his office because he did not have the right equipment to do it; he was unsure whether Claimant had access to medical services to have the cast removed. *Id*.

Dr. Stempler believed that surgery is not warranted for Claimant's injury, but even with physical therapy, Claimant would have permanent pain, weakness, stiffness, and ultimately arthritis in the wrist. R.R. at 77a-78a & 84a. He did not believe Claimant will ever be able to resume work as a truck driver, even if

4

all he has to do is drive and does not have to secure loads on the truck. *Id*. at 79a-80a.

Dr. David Baker, M.D., an orthopedist, testified for Employer. He saw Claimant for an independent medical examination (IME) paid for by Employer on December 13, 2017. R.R. at 26a. Claimant no longer had the cast and told Dr. Baker that he did not have medical insurance or money for treatment, so he removed it himself in October. *Id*. at 31a-32a & 42a. Dr. Baker was able to conduct an examination, which showed the wrist was well aligned, had no swelling, and had good strength and range of motion; the exam also showed atrophy compared with the other wrist, which Dr. Baker attributed to the length of time Claimant had worn the cast. *Id*. at 27a-28a. Dr. Baker stated that for an injury like Claimant's, about 6 weeks in a cast would have been appropriate. *Id*. at 30a. Dr. Baker opined that if the cast had been removed and Claimant began physical therapy sooner, he would have been able to return to work earlier. *Id*. at 32a-34a. As it was, Dr. Baker recommended Claimant continue physical therapy through January 2018, then return to work in a capacity without heavy lifting or repetition; he did not think Claimant would sustain permanent disability. *Id*. at 35a-36a, 40a-41a & 47a.

The workers' compensation judge (WCJ) issued an opinion concluding that Claimant had not established employee status. WCJ Op., 6/20/18, at 4 (WCJ I); R.R. at 158a. The WCJ found Claimant credible except with regard to his testimony that he was an employee rather than an independent contractor, and also found Bixler's testimony credible. R.R. at 157a. The WCJ also emphasized that Claimant had signed and initialed the independent contractor agreement. *Id*. at 158a. On Claimant's appeal, the Board reversed the WCJ's finding concerning Claimant's employment status. Board Op., 10/24/19, at 5-6 (Board I); R.R. at 170a-71a. The

5

Board noted that employment status is a question of law reviewable on appeal, albeit based on facts of record, and emphasized Employer's control in assigning loads to drivers, paying drivers by the mile rather than by the load or job, paying for gas and insurance for its trucks, requiring use of its trucks for its jobs, and forbidding drivers from using its trucks to driver for other companies; the Board also observed that trucking was part of Employer's regular business. R.R. at 170a-71a. The Board concluded that the independent contractor agreement Claimant signed was not dispositive when considered against the evidence favoring employee status. *Id*. at 171a. The Board remanded to the WCJ for determination of the extent and duration of Claimant's disability. *Id*.

On remand, the WCJ did not take further evidence other than a stipulation by counsel that Claimant returned to work with a new employer at a higher rate of pay in October 2018. Certified Record (C.R.) at 196. Subsequently, the WCJ issued another decision finding Claimant sustained compensable total disability (at a weekly benefit rate of $784.57) from the May 4, 2017, date of injury through September 30, 2018. WCJ Op., 6/5/20, at 5 (WCJ II); R.R. at 178a. Relevant to this appeal, the WCJ concluded that Employer had not offered Claimant specific light-duty work during his period of disability; the WCJ also noted but did not specifically opine on the medical experts' testimony concerning the length of time Claimant remained in a cast. R.R. at 178a.

On Employer's post-remand appeal, the Board affirmed, finding Employer's offer to pay Claimant for riding along with other drivers lacked the requisite specificity and documentation to warrant a suspension of benefits. Board Op., 4/21/21, at 5-6 (Board II); R.R. at 194a-95a. The Board also declined to find that the length of time Claimant was in a cast amounted to a refusal to accept

6

reasonable treatment such that benefits could be limited temporally. R.R. at 195a. Finally, the Board reaffirmed its previous conclusion that Claimant was an employee rather than an independent contractor. *Id*. at 196a. Employer now appeals to this Court, arguing that the Board erred in reversing the WCJ's determination of contractorship and that the WCJ should not have granted benefits on remand because Claimant refused a job offer and reasonable medical treatment.[1]

## II. Discussion

## A. Employment Status

Under Sections 103 and 104 of the Workers' Compensation Act (Act),[2] an independent contractor is not entitled to benefits, due to the absence of a master/servant relationship. *See* 77 P.S. §§ 21-22. Thus, a claimant's employment status is a threshold determination, and the claimant bears the burden of proof. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000). Nevertheless, "neither the compensation authorities nor the courts should be solicitous to find contractorship rather than employment," and given the remedial and salutary goals of workers' compensation, the factual bases favoring a finding of an employer-employee relationship need only be slightly stronger than those favoring contractorship. *Id*. at 331. The existence of an employment

[1] Appellate review in workers' compensation proceedings is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 331 n.2 (Pa. 2000). Review of the WCJ's findings of fact is limited to whether those findings are adequately supported by the evidence as a whole; credibility is solely an issue for the WCJ as finder of fact and findings of fact will be overturned only if they are arbitrary and capricious. *Bethenergy Mines, Inc. v. Workmen's Comp. Appeal Bd. (Skirpan)*, 612 A.2d 434, 437 (Pa. 1992).

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

relationship is a question of law that is determined on the unique facts of each case. *Id.* at 330-31. The inquiry entails the following indicia and principles:

> Control of manner [in which] work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

> Whether some or all of these factors exist in any given situation is not controlling. Further, while each factor is relevant, there are certain guidelines that have been elevated to be dominant considerations. . . . [C]ontrol over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status. Moreover, it is the existence of the right to control that is significant, irrespective of whether the control is actually exercised.

*Universal Am-Can*, 762 A.2d at 333 (citations and quotation marks omitted).

Additional factors may include the putative employer's withholding of wages for income taxes, acquisition of (or failure to acquire) workers' compensation insurance, and the existence of a signed contractor agreement. *Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1163 (Pa. Cmwlth. 2016). With regard to such agreements, caution is warranted in light of the potential for employers to use them as a means of avoiding legitimate workers' compensation liability. *Berkebile Towing & Recovery v. Workers' Comp. Appeal Bd. (Harr)*, 254 A.3d 783, 794 (Pa. Cmwlth. 2021) (noting that WCJ gave agreement little weight, finding it was "little more than a pretext for Berkebile Towing to avoid the obligations of having employees"); *Edwards*, 134 A.3d at 1165 n.2 (Friedman, J., dissenting) (pointing out WCJ finding of fact that the purpose of the agreement "was

8

to attempt to avoid liability for any work injuries sustained by the aides who work for and are employed by [Company]").

The trucking industry gives rise to specific concerns when analyzing employment status and a line of cases (including both "regular" drivers and tow truck drivers) provides guidance. A trucking company's requirement that drivers comply with federal trucking regulations is not dispositive of employment status. *Universal Am-Can*, 762 A.2d at 332. If drivers are given a deadline for making a delivery, it has been found indicative of employment status. *Bishop v. Workers' Comp. Appeal Bd. (Walters)* (Pa. Cmwlth., No. 974 C.D. 2013, filed Oct. 23, 2013), slip op. at 10, 2013 WL 5764569, at *5 (unreported).[3] As will be explored below, recent cases have also emphasized the putative employer's ownership of the trucks used by the claimants as a substantial factor tending towards employment relationships. In the context of the trucking industry, where there may be little if any direct supervision of the driver on the road, this is reasonable because the trucks themselves, which are substantial assets, are the instrumentalities of the work being done.

In *Sarver Towing v. Workers' Compensation Appeal Board (Bowser)*, 736 A.2d 61 (Pa. Cmwlth. 1999), the claimant, a tow truck driver, signed an agreement with the employer to work on commission and be responsible for his own taxes. *Id*. at 62. The claimant was provided with a truck owned by the employer but could not use it to work for anyone else. *Id*. at 62-63. He received assignments by pager or telephone and was not directly supervised while on jobs. *Id*. The injury did not occur when the claimant was driving, but when he was picking up a computer

---

[3] Unreported memorandum opinions of this Court may be cited for their persuasive value pursuant to Rule 126(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b)(1), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

9

in the office at employer's request.[4]  *Id*. at 62.  The WCJ found the claimant to be an independent contractor, but the Board reversed and this Court affirmed, emphasizing that the employer "exercise[d] substantial control over [the c]laimant and the manner in which he performed his work," such as limiting his use of its trucks to work only its jobs, requiring him to be on call 24/7, and retaining the ability to take back the truck and equipment at any time if it was not satisfied with his work.  *Id*.  Moreover, "it is the existence of the *right* to control the manner of [a c]laimant's work which is critical, even when that right is not exercised." *Id*. (emphasis in original).

In *Baykhanov v. Workers' Compensation Appeal Board (Onixe Express)* (Pa. Cmwlth., No. 245 C.D. 2018, filed Oct. 12, 2018), 2018 WL 4940168 (unreported), the claimant, a car carrier driver, signed an independent contractor agreement, the employer owned and assigned the claimant his truck, the claimant received his assignments from a dispatcher, he was not supervised while on assignments, he was paid by the job and received a 1099 tax form, and he was free to reject assignments although he stated he rarely did so.  *Id*., slip op. at 1-4.  The WCJ did not find an employment relationship and the Board affirmed.  *Id*., slip op. at 6.  In a divided memorandum opinion, this Court affirmed, emphasizing the WCJ's determination that the claimant's testimony that he was an employee was less credible than that of the employer's witnesses that the claimant was an independent contractor.  *Id*., slip op. at 10 & n.4.  This Court also noted that whereas the injury in *Sarver* occurred when the claimant was moving a computer in the office at the

---

[4] Although the claimant in *Sarver* was injured while performing an office task rather than while driving, this Court's analysis emphasized the driving aspect of the claimant's work for the employer and concluded that in light of sufficient evidence of an employment relationship, the employer's belief that it could ask the claimant to move a computer arose out of its authority to control his work generally.  736 A.2d at 63.

employer's request and not driving, Baykhanov was injured while driving, which was "what he contracted to do" for the employer. *Id.*, slip op. at 13.

The dissent in *Baykhanov* would have found an employment relationship. *Baykhanov v. Workers' Comp. Appeal Bd. (Onixe Express)* (Pa. Cmwlth., No. 245 C.D. 2018, filed Oct. 12, 2018) (Covey, J., dissenting), 2018 WL 4940168. The dissent noted the remedial goals of workers' compensation law, the policy in favor of finding an employment relationship, and the nature of the trucking business. *Id.*, slip op. at 3 & 7 (citing *Universal Am-Can* and *Edwards*). The dissent also emphasized that the employer owned, insured, and paid for gas for the truck and that the claimant only operated the vehicle "through the defendant's authority," which the employer clearly had the right to exercise. *Id.*, slip op. at 4-6 (quoting *Sarver* and *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 611-12 (Pa. Cmwlth. 2012)).

In *Baum v. Workers' Compensation Appeal Board (Hitchcock)*, 721 A.2d 402 (Pa. Cmwlth. 1998), the company owned the delivery trucks and received payment from customers, then paid the claimant in cash for each truckload or job. *Id.* at 403-05. The claimant had the ability to decline work. *Id.* at 404. However, the company exercised control over where the claimant drove, the method of loading, and the routes. *Id.* The WCJ and Board both found an employment relationship, and this Court agreed, specifically concluding that the ability to decline work did not defeat the otherwise persuasive evidence of an employer-employee relationship. *Id.* at 406 ("[J]ust because [the c]laimant had the ability to decline work whenever he chose to do so [did] not mean that an employer-employee relationship did not exist, only that the relationship was one which gave [the c]laimant flexibility in determining his work schedule[.]").

11

Recently, in *Berkebile Towing*, the claimant, a tow truck driver, signed an agreement, was paid by the job, could decline a job but rarely did, could not use the company's trucks for outside work, and was not supervised or directed when actually working. 254 A.3d at 793-95. The WCJ and the Board both found an employment relationship. *Id*. at 786. This Court reviewed the above cases and concluded that although the facts resembled both *Sarver* (where employment status was found) and *Baykhanov* (where contractor status was found), the WCJ and Board did not err in relying on *Sarver* to hold that the claimant had established employment status. *Id*. at 795-96.

Here, Employer and UEGF argue that Claimant did not establish employment status because Claimant failed to show that Employer had the right to control Claimant's work; therefore, the Board erred in reweighing the evidence and reversing the WCJ. Employer's Br. at 16-18; UEGF Br. at 8-10. Claimant argues that given the standard of review and precedent, the Board correctly concluded that Claimant was an employee. Claimant's Br. at 4-6.

The facts concerning Claimant's employment status are not in serious dispute, as Claimant's and Bixler's testimony was generally consistent.[5] The following facts weigh in favor of finding contractorship. Claimant acknowledged signing Employer's agreement, and although the parties disagree whether Claimant read or understood it, the agreement is a recognized factor tending towards contractorship, as are his being paid by the mile and receiving a 1099 IRS form. *See* R.R. at 108a-09a, 116a-19a, 123a, 139a-40a & 144a-47a. Claimant determined his

---

[5] The WCJ wrote that "Claimant's testimony is found to be credible except to the extent that he testified that he was an employee of the Employer." WCJ I at 3; R.R. at 157a. The Board noted, however, that "whether Claimant was an employee or not is a legal conclusion, not a factual issue that the WCJ could make a credibility determination concerning." Board I at 4 n.2; R.R. at 169a.

12

driving routes himself. *Id*. at 122a & 142a-43a. Employer did not pay for Claimant's meals and accommodations on the road. *Id*. at 120a-22a & 143a.

Other facts weigh in favor of finding employee status. Employer owned and insured the trucks and paid for gas. R.R. at 120a-22a. Claimant did not keep Employer's trucks at his home when he was not working. *Id*. at 106a-07a & 121a-22a. He was free to work for other companies but could not use Employer's trucks to do so. *Id*. at 121a-22a, 126a, 144a & 147a. As discussed in *Sarver*, a trucking company's authority over its trucks, including barring drivers from using them for outside work and the implied right of the company to take the truck away from the driver, is a "very substantial" factor when considering the extent of the company's control over the driver's work. 736 A.2d at 63. As noted, the extent of the employer's right to control is recognized as "first among equals" among the employer-employee relationship inquiry factors. *See Universal Am-Can*, 762 A.2d at 333; *Edwards*, 134 A.3d at 1162.

Also, while on the road in Employer's truck, Claimant would call in to Employer's dispatcher and receive another assignment; Employer apparently also would call Claimant and offer assignments, which he could refuse. *Id*. at 121a-22a & 141a. As discussed in *Baum*, the ability to decline a driving assignment is not dispositive of a contractorship. 721 A.2d at 406. Employer gave Claimant delivery deadlines. R.R. at 142a-43a. As noted, a trucking company's authority to set such deadlines may be an indicator of employee status. *Bishop*, slip op. at 10, 2013 WL 5764569, at *5.

Many of these facts, in favor of both contractorship and employee status, resemble commonalities in *Sarver*, *Baykhanov*, and *Berkebile Towing*:

13

Claimant signed an agreement[6] and received a 1099 IRS form; Employer owned and insured the trucks and paid for gas; and Claimant got assignments from the company's dispatcher, was not directly supervised while driving, and chose his own routes. Here, as in *Baykhanov* and *Berkebile Towing*, Claimant could refuse an assignment. This point was not at issue in *Sarver*, but evidence there indicated that the claimant was on call on a 24/7 basis; nevertheless, as noted in *Baum*, the ability to refuse an assignment is not dispositive of contractor status. Conversely, there was no evidence in *Baykhanov* that, as in *Sarver*, *Berkebile Towing*, and this case, the company barred its drivers from using its trucks for outside work.

Here, as in *Baykhanov* and *Bishop*, Claimant was given a timeframe or deadline for deliveries. In *Baykhanov*, this was found not dispositive, whereas in *Bishop*, it was specifically noted as part of the basis for finding employment status (both decisions were unreported). In *Baykhanov*, the claimant was paid 25% of the gross amount the customer paid the trucking company for the trip. Stated otherwise, the claimant shared in the risk inherent in the trucking company's negotiated payment for each trip. Here, by contrast, Claimant was guaranteed payment for each mile he drove Employer's truck. Payment by the mile is a variation on payment by the hour, which is the hallmark of an employment relationship. Unlike in *Baykhanov*, the entire risk here is borne by Employer, who must pay Claimant for

---

[6] As noted, the WCJ specifically emphasized the agreement here when denying an employment relationship. WCJ I at 4; R.R. at 158a. The Board, however, disagreed, pointing out that the agreement was but one factor and was not conclusive because sufficient evidence existed of an employment relationship. Board I at 6; R.R. at 171a. This is because in recent cases, similar agreements have been viewed with disapproval by both workers' compensation adjudicators and this Court as pretexts for putative employers to avoid liability when an employment relationship has otherwise arisen. *See Berkebile Towing*, 254 A.3d at 794; *Edwards*, 134 A.3d at 1165 n.2 (Friedman, J., dissenting).

each mile he drives regardless of what the customer pays or, even, does not pay Employer.

This case is close. Given the fact-sensitive nature of these cases and the standard of review, which binds us to the facts as found by the WCJ, we simply conclude that the facts here more closely resemble those in *Baum* and *Sarver*. As in those cases, Employer exercised significant control because it owned the trucks used by its drivers and paid its drivers by the mile. Claimant could refuse an assignment, but this did not defeat his claim to employment status.

We reiterate that employment status is a question of law fully reviewable on appeal and remain mindful of the remedial policy of workers' compensation in general, as well as the specific directive from our Supreme Court that neither workers' compensation adjudicators nor the courts should be "solicitous" to find contractor status if a "reasonable view" of the facts and evidence allows at least slightly stronger inferences in favor of employment status. *Universal Am-Can*, 762 A.2d at 330-31; *Thomas v. Bache*, 40 A.2d 495, 497 (Pa. 1945). We therefore find the facts here, viewed reasonably and in the unique context of the trucking industry, sufficiently support an inference that Claimant was an employee. The Board therefore did not err when it reversed the WCJ's determination that Claimant was a contractor.

## B. Refusal of Job Offer

In the context of claim petition litigation, if the WCJ determines that the evidence supports a finding of disability only for a closed period of time, he is free to make such a finding. *Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Hilton)*, 117 A.3d 232, 246 (Pa. 2015). The claimant bears the burden of

establishing disability, including its duration. *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ.)*, 942 A.2d 939, 953 (Pa. Cmwlth. 2008). Although an employer seeking to limit a claimant's benefits based on available work does not bear the overall burden, the standard for evaluating a job offer in these circumstances is that the offer must provide the claimant with a general job classification or state whether the job is within a category for which the claimant has received medical clearance, along with a basic description of the job.[7] *Hockenberry v. Workmen's Comp. Appeal Bd. (Pa. State Police)*, 672 A.2d at 396-97 (Pa. Cmwlth. 1996). The employer "need not specify every aspect of the job in question. . . . Rather, the referral should be reviewed in a common sense manner in order to determine whether a suitable position has been made available to the claimant." *Eidem v. Workers' Comp. Appeal Bd. (Gnaden-Huetten Mem. Hosp.)*, 746 A.2d 101, 104 (Pa. 2000). Determinations concerning job offers are questions of fact within the WCJ's discretion and authority. *See Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap)*, 81 A.3d 830, 846 (Pa. 2013).

Here, Employer argues that Claimant should not receive benefits because Employer offered Claimant a job riding along with other drivers as a passenger and Claimant "refused" it. Employer's Br. at 18. Employer maintains that its offer was sufficiently specific for Claimant to have understood it. *Id*. at 19.[8] Claimant responds that the WCJ's determination that Employer's job offer was

---

[7] In *School District of Philadelphia v. Workers' Compensation Appeal Board (Hilton)*, 117 A.3d 232, 244 (Pa. 2015), our Supreme Court held that in the claim petition context, when a disabling work-related injury has not yet been accepted or adjudicated, an employer seeking to present evidence of a job offer in order to limit the claimant's temporal eligibility for benefits need not comply with notice and documentation requirements that would be needed if the employer was seeking to suspend or modify already- warded benefits.

[8] UEGF did not brief this issue.

16

insufficiently specific was within the WCJ's discretion as fact-finder and was not in error.  Claimant's Br. at 6.

Claimant initially stated Employer had not contacted him about light-duty work.  R.R. at 114a.  Claimant later acknowledged that Employer spoke to him one time about riding along with other drivers as a passenger but did not bring it up again.  *Id*. at 124a.  Bixler, for Employer, confirmed that he offered Claimant the ability to ride along with other drivers for some pay and stated that Claimant did not respond to that offer.  *Id*. at 145a.  Bixler acknowledged, however, that he had not given Claimant any more specific information about the offer.  *Id*. at 149a-50a.

The WCJ found Claimant generally credible except to the extent that he "was not offered light duty as he admitted to being offered to drive [sic] with other drivers."  WCJ II at 4; R.R. at 177a.  The WCJ found Bixler credible; however, "there was no specificity as to the light-duty job."  R.R. at 177a.  The WCJ ultimately concluded that Claimant established disability from the date of injury through September 30, 2018, at which time he returned to work for another employer at a higher pay rate, and that Claimant "was not offered any specific light duty job during that period of time."  *Id*. at 178a.  The Board, affirming, noted that the offer as described by Bixler "carried no specific duties or wage rate."  Board II at 5; R.R. at 194a.

Given our standard of review, which reserves determinations concerning job offers to the WCJ as finder of fact, the WCJ did not err in finding that Employer's offer lacked sufficient specificity.  Employer's offer to pay Claimant for riding along with other drivers seems simple enough, but the facts here do not include the date when the offer would take effect or expire, a rate of pay, a schedule, or an assurance that the work would remain within Claimant's injured

17

capacity. There is no indication that Employer's offer was in bad faith or deliberately vague, but the WCJ was within his discretionary authority in finding it insufficient to limit or negate an award of benefits in the face of evidence that Claimant established disability from the date of injury through September 30, 2018, when he returned to work for another employer at a higher rate of pay. We therefore find the Board did not err in affirming this aspect of the WCJ's decision.

### C. Refusal of Reasonable Medical Treatment

Section 306(f.1)(8) of the Act provides in part: "If the employe shall refuse reasonable services of health care providers, surgical, medical and hospital services, treatment, medicines and supplies, he shall forfeit all rights to compensation for any injury or increase in his incapacity shown to have resulted from such refusal." 77 P.S. § 531(f.1)(8). As noted previously, in claim petition proceedings, the claimant bears the overall burden of showing work-related disability, including the duration during which the claimant is eligible for benefits, and a WCJ may order benefits for a closed period if the evidence supports such a limitation. *Sch. Dist. of Phila.*, 117 A.3d at 246; *Coyne*, 942 A.2d at 953. However, if an employer seeks to limit a claimant's recovery to a closed period based on a refusal of reasonable medical treatment, the burden of proving that refusal rests with the employer. *Burkey v. Workmen's Comp. Appeal Bd. (Info Network Sys.)*, 650 A.2d 1120, 1124 (Pa. Cmwlth. 1994). The matter is a factual determination within the discretion of the WCJ. *Alltel, Inc. v. Workers' Comp. Appeal Bd. (Baum)*, 829 A.2d 739, 742 (Pa. Cmwlth. 2003).

In *Burkey*, the WCJ awarded benefits for a closed period through the date on which the WCJ found the claimant had refused reasonable and necessary

medical treatment, specifically a surgery recommended by her treating doctor. 650 A.2d at 1122. The Board affirmed, but this Court reversed, concluding that the evidence did not support the WCJ's determination because the claimant's treating doctor testified that the employer had neither paid her bills nor preapproved the requested surgery, so it could not take place. *Id*. at 1122-24. Because the employer failed to show that the claimant was offered and refused reasonable treatment, the WCJ erred in awarding only a closed period of benefits. *Id*. at 1127.

In *Patterson v. Workmen's Compensation Appeal Board (Lenart)*, 305 A.2d 778 (Pa. Cmwlth. 1973), the claimant sustained left leg fractures, which the employer accepted. *Id*. at 779. In subsequent termination proceedings, the employer argued that the claimant left his cast on too long and therefore forfeited his entitlement to further benefits. *Id*. at 780. The WCJ denied termination and the Board affirmed, as did this Court. *Id*. at 781 & 789. The claimant's treating doctor testified that the claimant's lengthy time in a cast (1½ years) may have contributed to development of osteoarthritis; however, no testimony was offered as to how much sooner the cast could or should have been removed. *Id*. at 780. Moreover, even if the cast could have been removed earlier, "[a] person in a cast is not refusing treatment even though he may be dilatory in returning to the doctor. There is no showing that [the claimant] did not intend to return to the doctor relative to having the cast removed." *Id*. Moreover, aside from the development of osteoarthritis, the extended time in a cast had not adversely affected the claimant's condition because the fractures healed successfully. *Id*.

Here, Employer argues that because Claimant had his cast removed in November 2017 and not in July 2017 as recommended by both medical experts, he

19

improperly extended his need for benefits. Employer's Br. at 19-20.[9]  Claimant responds that the evidence did not show that he unreasonably refused to have his cast removed earlier and that the WCJ's determination that his disability lasted through September 30, 2018, rather than sooner, was within the WCJ's discretion and supported by the evidence.  Claimant's Br. at 6.

When Claimant testified in August 2017, three months after the injury, he stated that the cast was put on his wrist by a bone specialist in New York and he thought he would be getting it removed later that month. R.R. at 112a-14a.  Claimant did not testify again in these proceedings, so he was not questioned about the length of time he was in a cast after the issue arose in the course of the doctors' depositions.

Dr. Baker, who saw Claimant for a December 2017 IME at Employer's behest, found that Claimant's wrist fracture was healing well.  *Id*. at 27a-29a. However, Dr. Baker stated that Claimant's cast should have been on for only about 6 weeks, but that it was on for 5-6 months until Claimant removed it himself in October 2017.  *Id*. at 30a-32a.  Dr. Baker acknowledged that Claimant told him he did not have money to pay for the procedure and that because Employer did not accept the injury and Claimant did not have an insurance claim number, a medical facility might decline to see Claimant on a non-emergency basis.  *Id*. at 44a.  Dr. Baker opined that if Claimant's cast had been removed earlier and he had started physical therapy sooner, he could have been fully recovered by the IME, but due to the extended timeline caused by Claimant's time in the cast, Claimant needed physical therapy into January 2018.  *Id*. at 32a & 35a.

Dr. Stempler, Claimant's medical expert, stated in his deposition that when he saw Claimant on July 25, 2017, two months after the injury, Claimant was

---

[9] UEGF did not brief this issue.

still in the cast. R.R. at 73a-74a. Dr. Stempler agreed with Dr. Baker that Claimant's wrist had been in the cast "almost three times as long as it should have been." *Id*. at 77a. Dr. Stempler acknowledged that the length of time Claimant was in the cast contributed to atrophy in the left wrist as compared to the uninjured right wrist. *Id*. at 83a. He could not remove the cast when Claimant saw him because he did not have the proper equipment in his office to do so. *Id*.

The WCJ generally credited Dr. Baker over Dr. Stempler because Dr. Baker was able to do a physical examination of Claimant's wrist without the cast. WCJ II at 5; R.R. at 178a. The WCJ did not opine specifically on whether Claimant's extended time in a cast amounted to a refusal of reasonable medical treatment. However, the WCJ's determination that Claimant's disability lasted until he returned to work for another employer after September 2018 implies that the WCJ did not find Claimant had forfeited his right to benefits by refusing treatment. *See id*. The Board concluded that while the evidence showed that Claimant's cast had been on too long, it did not show that Claimant actively refused to have it removed or otherwise forfeited his eligibility for benefits. Board II at 6; R.R. at 195a.

We agree. Unlike here, there was no testimony in *Patterson* concerning how long the cast should have been on the claimant's leg. Nevertheless, we find persuasive our conclusions in *Patterson* that "[a] person in a cast is not refusing treatment even though he may be dilatory in returning to the doctor" and that a show of intent to not undergo a procedure or treatment is required to find refusal of treatment. *See* 305 A.2d at 780; *cf. Bereznicki v. Workers' Comp. Appeal Bd. (Eat 'N Park Hosp. Grp.)*, 989 A.2d 46, 48 (Pa. Cmwlth. 2009) (concluding that claimant's refusal to attend narcotics detoxification program paid for by employer warranted suspension of benefits).

21

The record is devoid of an offer of treatment or any refusal on Claimant's part. In his hearing testimony, Claimant stated that he expected to get the cast off soon. The only subsequent evidence as to why that did not happen was Dr. Baker's statement that Claimant told him that he did not have money or medical insurance. *See* R.R. at 44a. There is no evidence that Claimant sought to improperly extend his benefits, which at the time he was not even receiving since Employer did not accept the injury. Employer, who had previously reimbursed Claimant for the cost of having the cast put on, failed to show that it offered to pay for removal of the cast. If Employer had made such an offer and Claimant had refused, the evidence would have supported Employer's argument. Moreover, Claimant told Dr. Baker that he ultimately removed the cast himself, which suggests that Claimant did not "refuse" to have it removed, but rather, was unable to have it removed sooner by a doctor. Because Employer offered no evidence that removal of the cast was either offered to or refused by Claimant, the WCJ did not err in finding Claimant's disability lasted through September 30, 2018, and the Board did not err in affirming that determination.

### III. Conclusion

In light of the foregoing, the April 21, 2021, decision and order in Board II, which incorporates the Board's initial October 24, 2019, decision and order in Board I, is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IDI Logistics, Inc.,                     :
                     Petitioner        :
                                        :
          v.                     :
                                        :
Larry Clayton and Uninsured             :
Employers Guarantee Fund (Workers'      :
Compensation Appeal Board),             :        No. 514 C.D. 2021
                 Respondents     :

## O R D E R

AND NOW, this 18th day of October, 2022, the April 21, 2021, decision and order of the Workers' Compensation Appeal Board is AFFIRMED.


_____
CHRISTINE FIZZANO CANNON, Judge